IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| IRH VINTAGE PARK PARTNERS, LP, | § | CASE NO.  10-37503-H4-11 |
| | § | |
| | § | |
| VPI GENERAL PARTNER, LLC, | § | |
| | § | |
| VINTAGE PARK INVESTMENTS, LLC, | § | Jointly Administered |
| | § | |
| | § | Chapter 11 |
|    DEBTORS | § | |

PROPOSED JOINT DISCLOSURE STATEMENT UNDER
11 U.S.C. § 1125 AND BANKRUPTCY RULE 3016 IN SUPPORT
OF JOINT PLAN OF REORGANIZATION OF DEBTORS

THIS JOINT DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF THE DEBTORS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE.   THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE DEBTORS' PLAN OF REORGANIZATION.   ALL CREDITORS ARE URGED TO READ THE DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY.

ON _____, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE.   SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND ATTACHED AS EXHIBIT A, IS BEING SOUGHT FROM CREDITORS WHOSE CLAIMS AGAINST THE DEBTORS ARE IMPAIRED UNDER THE PLAN OF REORGANIZATION.   CREDITORS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION ARE URGED TO VOTE IN FAVOR OF THE PLAN AND TO RETURN THE BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT UPON COMPLETION IN THE ENVELOPE ADDRESSED TO HOOVER SLOVACEK LLP., ATTENTION: EDWARD L. ROTHBERG, 5847 SAN FELIPE, SUITE 2200, HOUSTON, TEXAS 77057, NOT LATER THAN _____, AT  _:_. . _____.M. HOUSTON TIME.

### TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. 1

DISCLOSURE STATEMENT ......................................................................................... 3

I.    INTRODUCTORY STATEMENT ...................................................................... 3

II.   VOTING PROCEDURES ..................................................................................... 5

III.  IMPAIRMENT OF CLAIMS ............................................................................... 6

IV.  NATURE AND HISTORY OF BUSINESS .......................................................... 8

    A.  SOURCE OF INFORMATION AND ACCOUNTING METHOD ............................... 8
    B.  GENERAL INFORMATION ABOUT THE DEBTORS ............................................. 8
       1.  The Debtors .......................................................................................... 8
          a.  Business Operation Model .......................................................... 8
          b.  Assets .......................................................................................... 9
          c.  Liabilities ................................................................................... 9
       2.  Financial Difficulties and Restructuring ........................................... 10
       3.  Financial Situation as of Petition Date .............................................. 10
       4.  Ownership and Management .............................................................. 10
          a.  General Overview ..................................................................... 11
          b.  Capital Structure ....................................................................... 11
          c.  Current Management Team ....................................................... 11
       5.  Significant Actions in Bankruptcy Case ........................................... 11
          a.  Voluntary Petition filing .......................................................... 11
          b.  Administration – "First Day" Motions ..................................... 12
          c.  Employment of Professional Persons ....................................... 12
          d.  Other Relevant Pleadings ......................................................... 13
    C.  CASE MANAGEMENT GOING FORWARD ........................................................ 13
       1.  Plan Negotiations ............................................................................... 13
       2.  Assumption and Rejection ................................................................. 13

V.    DESCRIPTION OF PLAN ................................................................................ 14

    A.  OVERALL STRUCTURE OF THE PLAN ........................................................... 14
    B.  ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS AND TIMING OF PAYMENT ....... 16
    C.  CLASSES OF SECURED AND UNSECURED CLAIMS AND TREATMENT OF INTERESTS ........... 16
    D.  MEANS OF EXECUTION OF PLAN: ............................................................... 19
    E.  BAR DATES ................................................................................................... 20
    F.  SUMMARY OF FINANCIAL PROJECTIONS ...................................................... 20

VI.  LIQUIDATION ANALYSIS ............................................................................. 21

    A.  METHODOLOGY. .......................................................................................... 21
    B.  ANALYSIS. ................................................................................................... 21

VII.  RISKS POSED TO CREDITORS .................................................................... 22

VIII.   ALTERNATIVES ............................................................................................ 22

   A.   CONVERSION TO CHAPTER 7 ................................................................................. 22
   B.   DISMISSAL ............................................................................................................. 22
   C.   NO ASSURANCE OF EITHER ................................................................................... 23

IX.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES ................................... 23

   A.   TAX CONSEQUENCES TO CREDITORS .................................................................... 23
      1.   Generally ...................................................................................................... 23
      2.   Unsecured Claims ........................................................................................ 23

X.   PREFERENCES AND FRAUDULENT TRANSFERS ....................................... 24

XI.   LITIGATION ................................................................................................... 24

XII.   MANAGEMENT OF THE REORGANIZED DEBTOR ...................................... 24

   A.   DIRECTORS OF THE DEBTORS ............................................................................... 24
   B.   MANAGEMENT COMPENSATION ............................................................................ 25

XIII.   ACCEPTANCE AND CONFIRMATION OF THE PLAN .................................... 25

   A.   ACCEPTANCE OF THE PLAN .................................................................................. 25
   B.   CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES ................... 25
   C.   OTHER REQUIREMENTS FOR CONFIRMATION ...................................................... 26
      1.   Best Interest of Creditors ............................................................................. 26
      2.   Financial Feasibility .................................................................................... 26
   D.   CRAM-DOWN - CONFIRMATION WITHOUT ACCEPTANCE BY ALL IMPAIRED CLASSES ....... 27

IV.   CONCLUSION .............................................................................................. 27

## DISCLOSURE STATEMENT

IRH Vintage Park Partners, LP ("IRH"), VPI General Partner, LLC ("VP GP"), and Vintage Park Investments, LLC. ("VPI") (collectively "Debtors"), debtors and debtors-in-possession herein, submit this Joint Disclosure Statement ("Disclosure Statement") under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 in Support of their Chapter 11 Plan of Reorganization to all of their known Creditors.

## I.    INTRODUCTORY STATEMENT

Debtors submit this Joint Disclosure Statement Under 11 U.S.C. § 1125 in support of their Chapter 11 Plan of reorganization under Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") in connection with its solicitation of acceptances of the Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code filed by the Debtors (the "Plan").  A copy of the Plan is attached as Exhibit A for your review.  All terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

The Debtors each filed petitions under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division, on September 2, 2010 and retained Edward L. Rothberg and Hoover Slovacek LLP as bankruptcy counsel.  The Debtors have prepared this Disclosure Statement to disclose that information which, in their opinion, is material, important, and necessary to an evaluation of the Plan. Pursuant to the terms of the United States Bankruptcy Code, this Disclosure Statement must be presented to and approved by the Bankruptcy Court.  Such approval is that required by statute and does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby.

The material herein contained is intended solely for the use of known creditors and interest holders of the Debtors, and may not be relied upon for any purpose other than a determination by them of how to vote on the Plan.  As to Contested Matters, Adversary Proceedings and other actions or threatened actions, this disclosure statement shall not constitute or be construed as an admission of any fact or liability, stipulation or waiver, but rather as a statement made in settlement negotiations under Rule 408 of the Federal Rules of Evidence. This disclosure statement shall not be admissible in any non-bankruptcy proceeding nor shall it be construed as to be advice on the tax, securities or other legal effects of the plan as to the holders of claims against or equity interests in the Debtors or their affiliates.

To ensure compliance with Treasury department circular 230, each holder of a claim or interest is hereby notified that: (a) any discussion of U.S. Federal Tax issues in this disclosure statement is not intended or written to be relied upon, and cannot be relied upon, by any holder for the purpose of avoiding penalties that may be imposed upon a holder under the Tax Code; (b) such discussion is included hereby by the Debtors in connection with the promotion or marketing (within the meaning of Circular 230) by the Debtors of the transactions or matters addressed herein; and (c) each holder should seek advice based upon its particular circumstances from an independent tax advisor.

Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible instruments or are digests of other instruments. While the Debtors have made every effort to retain the meaning of such other instruments or the portions transposed, it urges that any reliance on the contents of such other instruments should depend on a thorough review of the instruments themselves.

No representations concerning the Debtors or the Plan are authorized other than those that are set forth in this Disclosure Statement. Any representations or inducements made by any person to secure your vote which are other than those contained herein should not be relied upon, and such representations or inducements should be reported to counsel for the Debtors who shall deliver such information to the Bankruptcy Court. Finally, all terms not otherwise defined in this Disclosure Statement shall have the meanings assigned to them under the Plan.

Creditors should read this Joint Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made, except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code. No other party has been authorized to utilize any information concerning the Debtor or its affairs, other than the information contained in this Disclosure Statement, to solicit votes on the Plan. Creditors and holders of equity interest should not rely on any information relating to the Debtors, other than that contained in this Disclosure Statement and the exhibits attached hereto.

**EXCEPT AS SET FORTH IN THIS JOINT DISCLOSURE STATEMENT AND THE ATTACHMENTS, NO REPRESENTATIONS CONCERNING THE DEBTORS, THE ASSETS, THE PAST OPERATIONS OF THE DEBTORS, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS.**

**EXCEPT AS SPECIFICALLY NOTED, THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS ARE NOT ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. THE FACTUAL INFORMATION REGARDING THE DEBTORS, INCLUDING THE ASSETS AND LIABILITIES OF THE DEBTORS, HAS BEEN DERIVED FROM NUMEROUS SOURCES, INCLUDING, BUT NOT LIMITED TO, DEBTORS' BOOKS AND RECORDS, SCHEDULES AND DOCUMENTS SPECIFICALLY IDENTIFIED HEREIN.**

**THE DEBTORS ALSO COMPILED THE INFORMATION CONTAINED IN THIS JOINT DISCLOSURE STATEMENT FROM RECORDS AVAILABLE TO THEM, INCLUDING, BUT NOT LIMITED TO, PLEADINGS AND REPORTS ON FILE WITH THE BANKRUPTCY COURT, LOAN AGREEMENTS AND BUSINESS RECORDS.**

**THE APPROVAL BY THE BANKRUPTCY COURT OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE**

BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS JOINT DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

NEITHER THE DEBTORS NOR COUNSEL FOR THE DEBTORS CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACIES.  NEITHER THE DEBTORS NOR THEIR COUNSEL HAVE VERIFIED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, ALTHOUGH THEY DO NOT HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.

IF THE REQUISITE VOTE IS ACHIEVED FOR EACH CLASS OF IMPAIRED CLAIMS, THE PLAN IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN), WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

## II.   VOTING PROCEDURES

Any creditor of the Debtors whose claim is IMPAIRED under the Plan is entitled to vote, if either (1) the claim has been scheduled by the Debtors and such claim is not scheduled as disputed, contingent or unliquidated, or (2) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings, *provided, however*, any claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon motion by the creditor.  Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.  In addition, a creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Holders of impaired claims who are entitled to vote and fail to do so will not be counted as either accepting or rejecting the Plan.  Nevertheless, if the requisite vote is achieved for your class of impaired claims, you will be bound by the terms of the Plan.

A ballot to be used for voting to accept or reject the Plan is enclosed with this Joint Disclosure Statement and mailed to creditors entitled to vote.  A creditor must (1) carefully review the ballot and the instructions thereon, (2) execute the ballot, and (3) return it to the address indicated thereon by the deadline to enable the ballot to be considered for voting proposes.

**THE DEADLINE FOR RETURNING YOUR BALLOT
IS _____.M. CENTRAL TIME ON _____, 2010
(THE "VOTING DEADLINE").**

After completion of the ballot, creditors should return the executed ballot in the self-addressed envelope to:

**IRH VINTAGE PARK PARTNERS, LP
VPI GENERAL PARTNER, LLC
VINTAGE PARK INVESTMENTS, LLC
c/o EDWARD L. ROTHBERG/KATHY MAYLE
HOOVER SLOVACEK LLP
5847 SAN FELIPE, SUITE 2200
HOUSTON, TX  77057**

**VOTING INFORMATION AND INSTRUCTION FOR COMPLETING THE BALLOT:**

**FOR YOUR VOTE TO BE COUNTED YOU MUST COMPLETE THE BALLOT, INDICATE ACCEPTANCE OR REJECTION OF THE PLAN IN THE BOXES INDICATED ON THE BALLOT AND SIGN AND RETURN THE BALLOT TO THE ADDRESS SET FORTH ON THE PRE-ADDRESSED ENVELOPE.  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.**

**IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS UNDER THE PLAN, YOU MAY RECEIVE MORE THAN ONE BALLOT.  EACH BALLOT YOU RECEIVE VOTES ONLY YOUR CLAIMS FOR THAT CLASS.  PLEASE COMPLETE AND RETURN EACH BALLOT YOU RECEIVE.  YOU MUST VOTE ALL OF YOUR CLAIMS WITHIN A SINGE CLASS UNDER THE PLAN TO EITHER ACCEPT OR REJECT THE PLAN.  ACCORDINGLY, A BALLOT (OR MULTIPLE BALLOTS WITH RESPECT TO MULTIPLE CLAIMS WITHIN A SINGLE CLASS) THAT PARTIALLY REJECTS AND PARTIALLY ACCEPTS THE PLAN WILL NOT BE COUNTED.**

**THE BALLOT IS FOR VOTING PURPOSES ONLY AND DOES NOT CONSTITUTE AND SHALL NOT BE DEEMED A PROOF OF CLAIM OR INTEREST OR AN ASSERTION OF A CLAIM.**

### III.    IMPAIRMENT OF CLAIMS

A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interest of that class are modified under a plan.  Modification for purposes of determining impairment however, does not include curing defaults and reinstating maturity or cash payment in full.  Classes of claims or interests that are not "impaired" under a plan are conclusively presumed to have accepted the plan and are thus not entitled to vote.  Classes of claims or interests receiving no distribution under a plan are conclusively presumed to have rejected the plan and thus are not entitled to vote.  Acceptances of the Plan are being solicited only from

those persons who hold claims in an impaired class entitled to receive a distribution under the Plan.

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a plan, **unless**, with respect to each claim or interest of such class, the plan:

    1.    Leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

    2.    Notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of its claim or interest after the occurrence of a default:

    (a)  Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankrupt Code;

    (b)  Reinstates the maturity of such claim or interest as it existed before the default;

    (c)  Compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

    (d)  Does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or interest; or

    3.    Provides that, on the Effective Date the holder of such claim or interest receives, on account of such claim or interest, cash, equal to:

    (a)  With respect to a claim, the allowed amount of such claim; or

    (b)  With respect to an interest, if applicable, the greater of:

    (i)  Any applicable fixed liquidation preference; or

    (ii)  Any fixed preference at which the Debtors, under the terms of the security, may redeem the security.

    4.    In Article 5 of the Plan, the Debtors have identified the impaired classes of creditors under the Plan.  In the event there are questions regarding whether a person is in an impaired class, the person should assume that his or her claim is impaired and vote.  If the claim is determined to be impaired, the vote will be considered by the Bankruptcy Court. The Class  2, 3, 4, 5 and 6 holders of claims and the Class 7 interest holders of the Debtors are impaired under the Plan.

**IMPAIRED CREDITORS ANTICIPATED TO RECEIVE A DISTRIBUTION UNDER THE PLAN ARE BEING SOLICITED TO VOTE.  IF YOU HOLD AN ADMINISTRATIVE CLAIM OR UNIMPAIRED CLAIM, THE DEBTORS ARE NOT SEEKING YOUR VOTE.  ADDITIONALLY, THE VOTE OF EQUITY HOLDERS IS NOT SOLICITED AND IS DEEMED A REJECTION VOTE SINCE THEY RECEIVE NO DIVIDEND UNDER THE PROPOSED PLAN.**

## IV.     NATURE AND HISTORY OF BUSINESS

### A.  Source of Information and Accounting Method

The Debtors' books are maintained under the supervision of Guy Savage, Vice-President and Rebecca K. Rosato, Controller.  Accounting is on the accrual basis.  The historical financial information contained in this disclosure statement as well as the bankruptcy schedules and statement of affairs was derived from the Debtors' books and records.  **THE DEBTORS' BOOKS HAVE NOT BEEN AUDITED BY AN INDEPENDENT PUBLIC ACCOUNTANT (OTHER THAN AS EXPRESSLY DESCRIBED HEREIN).  NO ABSOLUTE REPRESENTATION IS MADE AS TO THE ACCURACY OF THE DEBTORS' RECORDS.  HOWEVER, THE DEBTORS HAVE ATTEMPTED TO ACCURATELY REFLECT THEIR BUSINESS OPERATIONS.**

### B.  General Information about the Debtors

1. THE DEBTORS

a.  Business Operation Model/Assets

IRH is a limited partnership that owns and operates a large 324 unit upscale gated apartment community located at 15727 Cutten Road, in northwest Houston ("Property").  IRH is owned by VP GP, its 1% general partner and VPI, its 99% limited partner.  VPI is also the 100% equity holder of VP GP.  The only business of these Debtors is the ownership and operation of the Property.

The Property was built in 2007 and is nestled on 13 acres of land laden with palm trees and tropical plants.  Each apartment offers luxurious amenities such as open floor plans with vaulted ceilings, garden tubs, crown molding, fireplaces, intrusion alarms and marble tile.  Additionally, the Property  offers its residents use of a media room with stadium seating, state of the art fitness room, cyber café and copy room, tropical pool and spa, outdoor fireplace and cabana, and clubhouse with gourmet kitchen and Home Theater System.   The Property offers six different floor plans of varying sizes from 814 sq feet to 1220 sq feet, with base monthly rent ranging from $1067-$1567 and up.   Current occupancy rates range between 92-95%.

Vintage Park purchased the Property in 2007 for a total purchase price of approximately $46,250,000.  Capmark Bank ("Capmark") is the Debtors' senior secured lender that financed $41,000,000 of the purchase price of the Apartments and Wrightwood Capital Lender, LP ("Wrightwood") also provided mezzanine financing in the amount up to

$7,615,000.

Shortly before the Petition Date, the Debtors obtained an appraisal of the Property. The value was set at $34.7 million. Capmark believes the Property may have a higher value. Therefore, Capmark is in the process of obtaining its own appraisal. As discussed more fully below, the Debtors have filed a motion requesting the Bankruptcy Court to determine the value if no agreement thereon can be reached with Capmark. Other than past due rents and intercompany accounts, the only other significant assets owned by IRH which are disclosed on the schedules are furniture, fixtures and equipment at book value. The Debtors believe that the values of these assets are subsumed in the $34.7 million appraisal.

The only asset owned by VP GP is its one percent general partnership interest in IRH. The only assets owned by VPI are its 100% interests in IRH and VP GP>

b. Liabilities

The Debtor's liabilities on the petition date are set forth on the claims analysis attached as Exhibit B. Generally, these liabilities consisted of the following:

Secured Liabilities – IRH's primary secured creditor is Capmark Bank ("Capmark" or "Senior Secured Lender"). As of the petition date, IRH was obligated to Capmark Bank in the amount of approximately $41 million in connection with two notes executed by IRH in favor of Capmark, the first in the original principal amount of $37,750,000 ("Note A"), and the second in the original principal amount of $3,250,000 ("Note B") (collectively the "Capmark Loan"). The Capmark Loan is secured by a lien on substantially all of IRH's assets.

Additionally, VPI is indebted to Wrightwood Capital Lender, LP ("Wrightwood Capital") pursuant to a Mezzanine Loan Agreement made to VPI for the benefit of IRH (the "Wrightwood Loan"). As of the Petition Date, the outstanding indebtedness owed to Wrightwood is approximately $2.6 million. The Wrightwood Loan is secured by a pledge of the limited partnership interests of VPI in IRH. There is an intercreditor agreement between Capmark and Wrightwood. The only source of revenue to repay the Wrightwood loan is the revenue generated by the Property. Historically, the Wrightwood loan has been paid directly through IRH.

IRH also estimates ad valorem property tax claims for the year 2010 in the approximate amount of approximately $820,000. This amount is currently being escrowed as part of the Capmark Loan.

Priority Tax Claims – IRH owes approximately $8,700 to Texas State Comptroller. The Internal Revenue Service has filed various claims totaling $7189 for liability related to unfiled tax returns. As of the Petition Date, Debtors were current in their federal tax filings and obligations and dispute each of these claims in their entirety. No other tax claims are known.

Priority Non-Tax Claims – none known.

General Unsecured Claims – IRH has scheduled approximately $2.2 Million in general unsecured claims.  Approximately $2.2 million of this amount is owed to affiliated entities which advanced funds to IRH in order to make debt service payments to Capmark and Vintage.  A portion of the affiliated debt can be offset against amounts owed back to IRH leaving a net balance of approximately $1.8 million.  This leaves approximately $200,000 in unsecured vendor debt.  It is possible that some of this debt is secured by mechanics and materialmen liens.  The Debtors have not examined these claims to determine their accuracy.  To obtain greater detail, please see the Claims Analysis attached as Exhibit B.

<u>Administrative Claims Analysis</u>

The Debtor's September 2010 Monthly Operating Report shows post-petition liabilities in the total amount of $79,175.29, consisting solely of post-petition trade payables, which is payable in the ordinary course of business.  No further administrative expenses are known other than accrued professional fees.

In summary, the Debtors have ample funds to satisfy ordinary course post-petition payables and attorneys fees.  Based on the foregoing, the Debtors believe that they will have sufficient funds to pay all administrative expense claims which will come due on the effective date.

2. FINANCIAL DIFFICULTIES AND RESTRUCTURING

IRH's loan with Capmark matured in July 2010.  With the current economic slump and collapse of the real estate market, the Debtors were unable to secure alternative financing and Capmark was unwilling to refinance the Capmark Loan.  On August 13, 2010, Capmark filed suit against Vintage Park in Harris County District Court, 190th Judicial District, alleging breach of contract and requesting an appointment of a receiver.   The parties reached a temporary agreement abating the appointment of a receiver.   However, on August 13, 2010, Capmark also noticed that the Property was scheduled for foreclosure on September 7, 2010, thereby precipitating this bankruptcy filing.

3. FINANCIAL SITUATION AS OF PETITION DATE

As mentioned above, IRH's secured indebtedness consists of claims totaling approximately $41.6 million.  The Senior Secured Lender has claimed a lien on virtually all of IRH's assets, whose value is significantly less than the total amount of secured claims.   The extent, validity and priority of the liens are not in dispute.   IRH also has reported general unsecured trade debt on its schedules of approximately $107,000 plus an additional $2.1 million in unsecured obligations owed by IRH to related entities.  These trade debt obligations are owed to approximately 65 trade creditors.   IRH employs approximately 10 employees.  As of the Petition Date, the Property maintained an occupancy rate between 92-95% for the 324 unit apartment complex.

4. OWNERSHIP AND MANAGEMENT

a. General Overview

The Debtors are all related business entities owned jointly by David A. Brannen, Guy Savage and G. J. Willem Noltes.   A chart detailing the structure of each of the Debtor entities is attached hereto as Exhibit E.   At present, the Debtor IRH and VPI have the same board of directors and officers, to which, Guy Savage and G. J. Willem Noltes are the sole members of the board.

These individuals receive no compensation for their services.  In addition to Mr. Savage and Mr. Noltes, Wayne Rafanelli is an independent director with respect to Debtor VP GP.  Prior to bankruptcy, Mr. Rafanelli was paid an independent director fee in connection with the decision to file for Chapter 11 and reimbursed him for attorneys' fees in connection therewith. The Debtors do not anticipate needing to make any more payments to Mr. Rafanelli during the bankruptcy case or after plan confirmation.

The Property is managed by an entity known as Investment Realty, LLC.  This company is owned by Mr. Savage.  Prior to bankruptcy, Investment Realty, LLC received a market based management fee equal to 4% of gross monthly rents.  Investment Realty, LLC has agreed to waive this fee during the pendency of the bankruptcy case.  Upon the Effective Date, IRH will recommence paying management fees to Investment Realty, LLC based on a 4% of gross monthly rents.

b. Capital Structure

IRH is a Georgia Limited Partnership and owns the Property.   VPI, also a Georgia Limited Partnership, is the 99% limited partner of IRH.  VP GP, a Delaware entity, is the general partner of IRH.   VPI is owned 100% by Huntington Farms Investment, LLC, a Georgia corporation.  VPI is the 100% owner of VP GP.

c. Current Management Team

G. J. Willem Noltes is the Vice-President of all of the Debtors.  Guy Savage is the Manager of all of the Debtors.   Rebecca K. Rosato serves as the controller of the Debtors.

5. SIGNIFICANT ACTIONS IN BANKRUPTCY CASE

a. Voluntary Petition filing

The Debtors each filed for Chapter 11 relief on September 2, 2010.   The Debtors continue to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code and are authorized to operate their business and manage their properties in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.   An immediate effect of the filing of the Debtors' bankruptcy petition is the imposition of the automatic stay under the Bankruptcy Code

which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of Liens against property of the Debtors, and the continuation of litigation against the Debtors. The relief provides the Debtors with the "breathing room" necessary to reorganize their business and prevents creditors from obtaining an unfair recovery advantage while the Chapter 11 Cases are ongoing.

b.  Administration – "First Day" Motions

Shortly after the first day of the Chapter 11 Cases, the Debtors filed several applications and motions seeking relief by virtue of so-called "first day motions." First day motions are intended to facilitate the transition between a debtor's pre-petition and post-petition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the bankruptcy court. The first day orders the Debtors obtained in these Chapter 11 Cases, which are typical of orders entered in business reorganization cases across the country, authorize, among other things:

*Motion for Joint Administration of Cases:* By this motion, Debtors requested that the Court jointly administer all of the Debtors Chapter 11 bankruptcy cases (Case No. 10-37503, 10-37508, 10-37511) under Case No.10-37503.   An order approving this motion was entered on September 8, 2010 (Docket #15).

*Emergency Motion for Order Authorizing Payment of Prepetition Wages, Taxes, and Benefits*:  By this motion, the Debtors requested that they be permitted to pay wages and benefits earned by employees and contract labor pre-petition. If the Debtors were not permitted to pay employees and contract labor, they would be at risk of losing valuable members of their staff, hindering their ability to continue operations and adversely impacting the value of the Debtors' assets.  This motion was granted on September 8, 2010 (Docket #19).

*Motion for Use of Cash Collateral*: The filing of a bankruptcy proceeding prohibits the debtor from using cash held in its own accounts to the extent that the cash constitutes collateral, unless the debtor obtains court permission or the lender consents.   Thus, soon after the bankruptcy, the Debtors sought to use cash proceeds of rents generated from its business to continue operations.  The cash collateral was encumbered by liens of Capmark.

Without Cash Collateral, the Debtors could not have continued operations.  The Court authorized cash collateral usage on an interim basis on September 8, 2010 (Docket #18) and again on September 28, 2010 (Docket #46).  A final order was entered by the Court on October 13, 2010 (Docket #63), authorizing cash collateral usage through the earlier of (i) the effective date of a confirmed plan of reorganization, (ii) the appointment of a trustee; (iii) the conversion of this case to a Chapter 7; or (iv) dismissal of this case.

c.  Employment of Professional Persons

The Debtors have been represented in this Chapter 11 Proceeding by Edward L. Rothberg and the law firm of Hoover Slovacek LLP and an order authorizing the employment of Mr. Rothberg and this firm was entered by the Court on September 8, 2010 (Docket #20).

d.  Other Relevant Pleadings

(1) Emergency Motion for Order pursuant to 11 U.S.C. §366 (i) Authorizing Payment of Cash Deposit for Adequate Assurance and (ii) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services:  By this motion, the Debtors sought to establish adequate assurance payments to utility providers in order to prevent the providers from discontinuing, altering or refusing services to the Debtors.  An order approving this motion was entered on September 29, 2010 (Docket #48).

(2) Emergency Motion  for Entry of Order Approving Debtors' Payment/Return of Pre-Petition Security Deposits in the Ordinary Course of Business: By this motion, the Debtors sought authorization to return pre-petition security deposits to tenants in the ordinary course of business.  An order approving this motion was entered on September 29, 2010 (Docket #47).

(3) Motion for Valuation of Collateral: By this motion, the Debtors sought to have the Court determine the value of the Property pursuant to Section 506(a) of the Bankruptcy Code (Docket #65). This motion was filed on October 19, 2010 and is currently pending before the Court.

## C.  Case Management Going Forward

### 1. PLAN NEGOTIATIONS

The Debtors have an exclusive period within which they may propose a plan of reorganization and  are proposing the Plan within that period.    Before submitting the current Plan, the Debtors negotiated the use of Cash Collateral with Capmark.

### 2. ASSUMPTION AND REJECTION

The bankruptcy law allows the Debtors to assume or reject any pending lease agreements or executory contracts that exist on the date of the order for relief.  Additionally, the law provides that the Debtors can assign their interest in lease agreements and executory contracts provided they cure all defaults and provide adequate assurance that the assignee will comply with the terms of the lease or contract.  Executory contract and lease assumption and rejection are treated in the Plan.  Any contract or lease not specifically assumed in the Plan, or by prior court order, is deemed rejected.

## V.   DESCRIPTION OF PLAN

### SUMMARY OF THE PLAN OF REORGANIZATION

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.  THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.**

### A.  Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders.  Upon the filing of a petition for relief under Chapter 11, Section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 Case.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The Plan should be read carefully and independently of this Disclosure Statement. The following analysis of the Plan is intended to provide a context for understanding the remainder of this Disclosure Statement and to assist in an understanding of the Plan and the proposed treatment of the Creditors.

The Debtors expect to implement their plan and continue in their business restructuring which should provide growth and full compliance with the plan. The Debtors have a strong core business and intend to reorganize around that business which, together with certain other operational improvements, is expected to be the basis for a viable reorganization plan.

The terms of the Debtors' Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of business. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

A copy of the Plan is attached as Exhibit A. Generally, If the Plan is confirmed by the Bankruptcy Court and consummated, (1) Allowed Administrative Claims and Priority Non-Tax Claims will be paid in cash in full; (2) Allowed Ad Valorem Claims of Taxing Authorities will be paid in cash full when due; (3) Allowed Non-Tax Priority Claims, if any, will be paid in cash in full within 30 days of the Effective Date; (4) Allowed Priority Tax Claims, if any, will be paid in full with twelve equal quarterly installments including interest at the statutory rate; (5) Allowed Secured Claim of Capmark Bank will be paid by the delivery of a promissory note from the Reorganized IRH for $34.7 million or such other amount as determined by the Court, plus interest at the rate prime rate of interest plus 1% or such other amount as determined by the Bankruptcy Court,  to be paid over a seven year period; (6) Allowed Unsecured Vendor Claims of $2500 or Less (and vendors electing to be treated in this class)  and Allowed Senior Secured Claims of Mechanics and Materialmen shall be receive the full amount of their respective Allowed Claim without interest; (7) Allowed Unsecured Deficiency Claim of Capmark Bank and Allowed Unsecured Vendor Claims in Excess of $2500 shall each receive a single payment equal to 10% of their respective Allowed Claim amount plus an unsecured Promissory Note for the balance of their unsecured claims;  (8) Wrightwood Capital Lender, LP shall have the option of (i) receiving payment in full of the Wrightwood Note with an extended maturity date until 2017 and no payment to be made until Capmark Bank's Allowed Claims have been paid in full or (ii) collectively 49% of the New Partnership Interest in the Reorganized IRH and VP GP  in full satisfaction of  its Claim, with a monthly Preferred return of $20,000, if funds are available, and redeemable at the Reorganized IRH's option for $2.6 million; (9) Allowed Unsecured Claims of affiliates will be offset against debts owed to the Debtors and the balance, if any will be subordinated to the payment of all other classes; and (10) Interests of the existing Equity Holders will be extinguished and New Partnership Interests in the Reorganized IRH and VP GP shall be issued to the Equity Holders in exchange for a $1 million Equity Infusion. The Equity Holders shall receive all New Partnership Interests, except for any interest obtained by Wrightwood, and retain the option to purchase any Equity Interests obtained by Wrightwood for $2.6 million. The Effective Date of the Plan is the date on which the Confirmation Order becomes a Final Order.

On the Effective Date (and at certain times thereafter), the Reorganized Debtor will distribute Cash, New Partnership Interests, and other property in respect of Classes of Claims as provided in the Plan. All Classes of Claims and Interests are "impaired" for voting purposes.

### B. <u>Administrative Expenses and Priority Tax Claims and Timing of Payment</u>

The Holders of Administrative Expense Claims against the estate and Tax Claims are treated as generally described below

<u>Payment of Administrative Claims</u>. Each Holder of an unpaid Allowed Administrative Claim shall be paid in Cash in full on the later of thirty (30) days after the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless the Holder of such Claim agrees to a different treatment.

<u>Payment of Non-Tax Priority Claims</u>. Each Holder of an unpaid Allowed Non-Tax Priority Claim shall be paid in Cash in full on the later of thirty (30) days after the Effective Date or the date such Claim becomes an Allowed Non-Tax Priority Claim, unless the Holder of such Claim agrees to a different treatment.

<u>Payment of Unsecured Priority Tax Claims</u>. The Allowed Priority Tax Claims shall be paid in quarterly installments beginning on the first day of the first full calendar quarter following the Effective Date, and continuing on the same date of each succeeding calendar quarter for a period of twelve quarters, until such Claims are paid in full. Such deferred cash payments shall have a value as of the Effective Date the Plan, equal to the allowed amount of such Claims. In computing the present value of such Claims, the interest rate applied shall be the interest rate, which is currently 4.25%, as determined by Texas Tax Code Section 110.060(b) from the Effective Date until paid.

<u>Payment to Professionals</u>. All payments to professionals for actual, necessary services and costs advanced in behalf of the bankruptcy up until the Confirmation Date shall be pursuant to Bankruptcy Court order and subject to the restrictions of 11 U.S.C. §330. Professional fees incurred for services rendered and costs advanced subsequent to the Effective Date shall be the liability of the Reorganized IRH.

### C. <u>Classes of Secured and Unsecured Claims and Treatment of Interests</u>

The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are generally described below

**Class 1. Allowed Secured Claim of Taxing Authorities.**

Class 1 consists of the Allowed Secured Claims of Ad Valorem taxing authorities for the year 2010 and any prior years secured by a lien on all of the Debtors' assets.  Class 1 Claims are not impaired.

Treatment: Allowed Secured Class 1 Claims shall be paid in cash in full when due without interest or penalty.  The Allowed Secured Class 1 Claims Holders shall retain their liens until such time as they are paid in full.

**Class 2.Allowed Secured Claim of Capmark Bank of $34.7 million**.

Class 2 consists of the Allowed Secured Claims of Capmark secured by liens on substantially all of the Debtors' assets.  The Class 2 Claim is impaired.

Treatment. The Holder of the Allowed Secured Class 2 Claim shall receive a promissory note from the Reorganized IRH in the principal amount of $34.7 million or such other amount as determined by the Court, payable at a rate of interest equal to the prime rate, plus .75%, which is currently 4.25%, or such other amount as determined by the Bankruptcy Court.  Beginning on the first day of the first calendar month after the Effective Date, and continuing on the first day of each succeeding month, the Reorganized IRH shall make monthly principal and interest payments for 84 months based on a 30 year amortization schedule, with no prepayment penalty.  The entire remaining principal balance due shall be paid at the end of the 84th month. The Holder of the Allowed Secured Class 2 Claim shall retain its liens as provided under its pre-Filing Date loan documents until such time as the claim is paid in accordance with the terms of this Plan.  The deficiency balance of Capmark's claim shall be treated as a Class 4 Claim under Section 4.4 of the Plan.

**Class 3. Allowed Vendor Unsecured Claims of $2500 or Less**

Class 3 consists of the Allowed Vendor Unsecured Claims of $2500 or less.  The Class 3 Claims are impaired.

Treatment:  The Holder of the Allowed Vendor Unsecured Class 3 Claims shall be paid in full without interest on the later of thirty (30) days after the Effective Date or the date such Claims become Allowed Claims.  The Class 3 Claims are impaired.

**Class 4. Allowed Unsecured Deficiency Claim of Capmark and Allowed Unsecured Vendor Claims in Excess of $2500**

Class 4 consists of the Allowed Unsecured Deficiency Claim held by Capmark and Allowed Unsecured Vendor Claims in excess of $2500.  The Class 4 Claims are impaired.

Treatment.  Within thirty (30) days of the Effective Date, the Holders of Class 4 Claims shall receive in full and final satisfaction of their Allowed Claims a single cash payment equal to ten percent (10%) of their Allowed Claims, plus new Unsecured Promissory Notes for the full remaining balance of their Allowed Class 4 Claims with the following terms:

o     Maturity:          The earlier of sale or refinance of the
                         Property or 7 years from the Effective Date.
o     Interest Rate:     Prime rate, plus 2%
o     Amortization:      None
o     Payments:          None until maturity

**Class 5. Allowed Wrightwood Claim of $2.6 million against Vintage Park Investment, LLC.**

Class 5 consists of the Allowed Claim of Wrightwood of $2.6 Million against VPI.  The Class 5 Claim is impaired under both Option 1 and Option 2.

Treatment.  The Holder of the Allowed Class 5 Claim shall elect either Option 1 or Option 2 described below.

Option 1:  The term of the Wrightwood Note shall be extended until December 31, 2017 and Wrightwood shall receive no payment with respect to the Wrightwood Note until Capmark Bank's Class 2 and Class 4 Claims are paid in full in accordance with the terms of this Plan. Otherwise, the Allowed Class 5 Claim shall be paid by the Reorganized VPI in full pursuant to the express terms of the original loan documents.

Option 2:   In full and final satisfaction of its allowed claim, the Holder of the Allowed Class 5 Claim shall receive shares of New Partnership Interests totaling 49% of the outstanding shares with (i) a Preferred return of $20,000/month, payable only from excess funds as solely determined by the Reorganized Debtors and (ii) in the event the Property is sold or refinanced, shall be fully redeemable by the Reorganized IRH in the amount of $2.6 million. The New Partnership Interests so issued shall be free and clear of all liens, claims, interests, and encumbrances of any kind.

**Class 6. Allowed Senior Secured Claims of Mechanics and Materialmen.**

Class 6 consists of the Allowed Senior Secured Claims of mechanics and materialmen whose liens are determined to be senior to the Class 2 Claim.

<u>Treatment</u>.   The Holders of Class 6 Allowed Senior Secured Claims of mechanics and materialmen shall be paid in full without interest on the later of thirty (30) days after the Effective Date or the date such Claims become Allowed Claims.  To the extent the Holder of a Class 6 Claim does not have a lien that is senior to the Class 2 Claim, it shall be treated as a Class 4 Allowed Unsecured Vendor Claim. The Class 6 Claims are impaired.

**Class 7.  Allowed Claims of Affiliates.**

Class 7 consists of the Allowed Claims of Affiliates.  The Class 7 Claims are impaired.

<u>Treatment</u>  The Holders of Class 6 Claims shall be permitted to offset any amount due the Debtors.  Otherwise, the remaining balance, if any, shall be subordinated to the payment in full of all Claims in Classes 1 through 6.

**Class 8.  Allowed Interests of Equity Holders.**

Class 8 consists of the Allowed Equity Interests in IRH and VP GP.  The Class 8 Interests are impaired.

Treatment.  Existing Equity Interests in IRH and VP GP shall be cancelled, and New Partnership Interests in the Reorganized IRH and VG GP shall be issued as provided for in Section 6.6 of the Plan. In exchange for the Equity Infusion of $1 million, to be paid within 30 days of the Effective Date, the Allowed Class 7 Equity Interest Holders will each receive a pro rata share of either (i) 100% of the New Partnership Interests if Wrightwood elects Option 1, described in Section 4.5.2 of the Plan, or (ii) 51% of the New Partnership Interests if Wrightwood elects Options 2, described in Section 4.5.2 of the Plan. Reorganized IRH shall hold an option to purchase all of the New Partnership Interests granted to Wrightwood in Section 4.5.2 for a purchase price of $2.6 million. The New Partnership Interests so issued shall be free and clear of all liens, claims, interests, and encumbrances of any kind.

**D.  <u>Means of Execution of Plan:</u>**

1.  <u>Vesting of Property of the Estate in Reorganized Debtor</u>. On the Effective Date of the Plan, all property of the Debtors and of their Estates shall vest in each of the Reorganized Debtors free and clear of liens, claims and encumbrances, except as otherwise provided by the terms of this Plan.  There shall be no substantive consolidation.

2.  <u>Continuation of Business Operations</u>.  From and after the Effective Date of the Plan, the Reorganized Debtors shall be authorized to continue their normal business operations and enter into such transactions as they deems advisable, free of any restriction or limitation

imposed under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan.  The funds from the Equity Infusion, along with cash flow of the operations, shall be used to fund payments required by the Plan.

3.  Equity Infusion: The principals of VPI shall collectively contribute $1 million to Reorganized IRH in exchanges for shares of New Partnership Interests as provided for in Section 4.7.1 of the Plan.

4.  Directors and Officers of Reorganized Debtors. The Directors and Officers of the Debtors are authorized to continue as Directors and Officers of the Reorganized Debtors from and after the Effective Date of the Plan.

5.  Source of funds for Payments due on the Effective Date.  The current operational revenues, collection of receivables and the Equity Infusion will be used to pay Administrative and Non-Tax Priority Claims, as well as any additional claims required by the Plan that are due on the Effective Date.

6.  New Partnership Interests.  The Reorganized IRH will issue New Partnership Interests as follows:

o    If Wrightwood elects Option 1 described in Section 4.5.2 of the Plan, Allowed Class 7 Equity Interest Holders will each receive a pro rata share of 100% of the New Partnership Interests, or

o    If Wrightwood elects Option 2 described in Section 4.5.2 of the Plan, Allowed Class 7 Equity Interest Holders will each receive a pro rata share of 51% of the New Partnership Interests, and Wrightwood shall receive the remaining 49% of the New Partnership Interests.

o    If Wrightwood elects Option 2 described in Section 4.5.2 of the Plan, the Reorganized IRH and VP GP shall hold options to purchase all of the New Partnership Interests granted to Wrightwood for a purchase price of $2.6 million.

**E.  Bar Dates**.

**Administrative Claims Bar Date**.  Any Holder of an Administrative Claim (including any cure Claims for executory contracts or leases that are assumed pursuant to this Plan, including Lease Claims) against the Debtors, except for administrative expenses incurred in the ordinary course of operating the Debtors' business, must file an application for payment of such Administrative Claim on or within sixty (60) days after entry of the Confirmation Order with actual service upon counsel for the Debtors, otherwise such Holder's Administrative Claim will be forever barred and extinguished and such Holder shall, with respect to any such Administrative Claim, be entitled to no distribution and no further notices.  The Debtors shall pay pre-confirmation quarterly U.S. Trustee fees in full in Cash within thirty (30) days after the Effective Date.  U.S. Trustee fees which accrue after confirmation shall be paid by the Reorganized Debtor until the case is closed or converted.  The Debtors shall file with the Court and serve on

the United States Trustee a monthly financial report for each quarter (or portion thereof) that the case remains open in a format prescribed by the United States Trustee. It is not necessary for the U.S. Trustee to file a proof of claim.

**Unsecured Claims Bar Date**. The deadline for filing a proof of claim for an unsecured claim (other than a claim for damages stemming from the rejection of an executory contract or lease) is January 19, 2011.

**Rejection Damage Claim Bar Date**. An Unsecured Claim arising from the rejection of an executory contract or unexpired lease must be filed no later than 20 days after the Effective Date of the Plan.

## F.  **Summary of Financial Projections**

Attached hereto as Exhibit C are financial projections prepared by management. These projections include actual results for the year 2009 up to September 2010, monthly forecast results for the balance of 2010 and 2011, and annual forecast for the term of the plan. The statements include projected income statements, balance sheets, cash flow forecasts, assumptions and significant historical data. The projections are conservative and establish that the Reorganized Debtor will be able to make the payments provided for in the Plan.

## VI.    **LIQUIDATION ANALYSIS**

### A.  **Methodology.**

The starting point in determining the amount which members of each impaired class of unsecured claims and interests would receive in a Chapter 7 case is to estimate the dollar amount that would be generated from the liquidation of the Debtor (the "Liquidation Proceeds"). The Liquidation Proceeds of the Debtors would consist of the proceeds from the sale of all of the assets of the Debtors, augmented by the cash held by the Debtors. The present value of the distribution from the Liquidation Proceeds is then compared with the present value offered to each of the classes of unsecured claims and interests of each such class.

### B.  **Analysis.**

A Liquidation Analysis reflecting the liquidation value of the Debtors' assets and the corresponding return to unsecured creditors in the event of a liquidation is attached hereto as Exhibit "D". The return to unsecured creditors is $0 because the assets have a market value of less than the $34.7 million and are secured by liens of approximately $41 million owed to Capmark. Thus, if these cases were converted to Chapter 7 proceedings, there would be no assets available for distribution to any creditor except Capmark. General Unsecured Creditors would receive nothing under a liquidation.

However, under the proposed Plan, General Unsecured Creditors are scheduled to have their Allowed Claims paid in full. Creditors holding claims of $2500 or less, or those electing to be treated in this class, will be paid in full within thirty (30) days of the Effective Date. All other General Unsecured Creditors will each receive a single payment equal to 10% of the Allowed

Claim amount within thirty (30) days of the Effective Date, plus a promissory note equal to the remaining balance of the Allowed Claim amount, to be paid upon sale or refinance of the Debtor or no later than seven years from the Effective Date.   Thus, the total value of the proposed distribution to General Unsecured Creditors far exceeds the amount that can reasonably be expected in a liquidation.

## VII.   RISKS POSED TO CREDITORS

The principal risk to the creditors is that the Plan will not be confirmed.   Absent confirmation of the Plan, Capmark will likely obtain stay relief and unsecured creditors would not receive any distribution on account of their Claims.

## VIII.   ALTERNATIVES

Although the Disclosure Statement is intended to provide information to assist creditors in making a judgment on whether to vote for or against the Plan, and although creditors are not being offered through that vote an opportunity to express an opinion concerning alternatives to the Plan, a brief discussion of alternatives to the Plan may be useful.  These alternatives include conversion to a Chapter 7 or dismissal of the proceedings.  The Debtors of course, believe the proposed Plan to be in the best interests of creditors.   The Debtors assess the alternatives as follows:

### A.  Conversion to Chapter 7

The first alternative would be to convert the Chapter 11 case to a Chapter 7 liquidating bankruptcy.   If this occurred, the Bankruptcy Court will appoint a trustee to liquidate the Debtors' assets for the benefit of its creditors.  The costs associated with a trustee would then be added to the additional tier of administrative expenses entitled to priority over general unsecured claims upon conversion.  Such administrative expenses include the Chapter 7 Trustee's commissions, as well as fees for professionals retained by the Chapter 7 Trustee to assist in the liquidation. The Trustee's commissions are based on disbursements to creditors.  The Trustee receives 25% of the first $5,000, 10% of the next $45,000, 5% of the next $950,000 and 3% on all amount disbursed in excess of $1 million.

In a Chapter 7 case, the Debtors would likely cease operating, the secured lenders would lift the stay and foreclose on the Debtors' assets, and unsecured creditors would receive no distribution on account of their claims.

### B.  Dismissal

Dismissal of the proceeding would likely result in the Debtors defending debt-collection litigation and numerous new lawsuits to collect debts.  The Secured lenders would foreclose on substantially all of the Debtors' assets, halting the Debtors' operations.  Even if there were unencumbered assets, the creditors who receive quick judgments will be able to execute and recover their claims leaving nothing for the remaining creditors.

C.  <u>No Assurance of Either</u>

There are other possibilities which are less likely, such as a competing plan proposed by a different party.  The Debtors have attempted to set forth the reasonable alternatives to the proposed Plan.  However, the Debtors must caution creditors that a vote must be for or against the Plan.  The vote on the Plan does not include a vote on alternatives to the Plan.  There is no assurance what course the proceedings will take if the Plan fails acceptance.

### IX.  <u>CERTAIN FEDERAL INCOME TAX CONSEQUENCES</u>

A.  <u>Tax Consequences to Creditors</u>

1.  GENERALLY

The tax consequence to any particular creditor may vary depending on their own circumstances and they should consult with their own tax professional for advice regarding the impact on them of their acceptance or rejection of the plan.

2.  UNSECURED CLAIMS

Holders of Class 4 Unsecured Claims will receive distributions from the Debtors.  A Class 4 Claimholder should either be treated as (i) recognizing ordinary income in an amount equal to cash received and recognizing a loss in an amount equal to the tax basis in the Claim or (ii)  recognizing a loss equal to the difference between the amount of cash received and their tax basis in their Claim.

A Claimholder's tax basis in a Claim should generally equal the amount included in income as a result of the provision of goods or services to the Debtors, except to the extent that a bad debt loss had previously been claimed. The gain or loss with respect to the Claim should be ordinary to the extent that it arose in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtors.

**DUE TO THE COMPLEX NATURE OF APPLICABLE TAX LAWS, CLAIMANTS SHOULD CONSULT WITH THEIR TAX PROFESSIONAL CONCERNING COMPLIANCE WITH AND THE AFFECT OF BOTH STATE AND FEDERAL TAX LAWS ON THEIR INTEREST BEFORE THEY CAST A BALLOT TO ACCEPT OR REJECT THE PLAN.**

**THE ACCOUNTANTS, ATTORNEYS, AND THE MANAGEMENT OF THE DEBTOR MAKE NO REPRESENTATIONS HEREIN CONCERNING THE IMPACT OF THE TAX LAW ON ANY INDIVIDUAL TREATED UNDER THE PLAN.**

## X.     PREFERENCES AND FRAUDULENT TRANSFERS

Under the Bankruptcy Code and Texas State Law, the bankruptcy estate may sue to recover assets (or their value) that were transferred by "voidable transfers", which includes assets transferred:

<ul style="list-style:none">
<li>(A) in fraud of Creditors,</li>
</ul>

<ul style="list-style:none">
<li>(B) in constructive fraud of Creditors – because the asset was transferred without sufficient consideration while the Debtors was insolvent,</li>
</ul>

<ul style="list-style:none">
<li>(C) as a preferential transfer - a payment before bankruptcy outside the ordinary course that allows a creditor to receive more than it would receive in liquidation, or</li>
</ul>

<ul style="list-style:none">
<li>(D) as an unauthorized post-bankruptcy transfer by the Debtors outside of the ordinary course.</li>
</ul>

The Debtors do not believe there are any transfers voidable under Section 550, 547, 548, 544, or similar provision of the Bankruptcy Code.  Prior to bankruptcy, all payments were made in the ordinary course of business and reasonably equivalent value was obtained for all assets transferred.  All post-bankruptcy payments were likewise in the ordinary course, or otherwise authorized by the Court.  Accordingly, the Debtors do not believe that any transfers are avoidable under Section 549 of the Bankruptcy Code.  On the basis of this analysis, the Plan releases all such causes of action against all parties.

If the Plan is not confirmed and a liquidating trustee or Chapter 7 trustee is appointed, it is possible that the trustee's analysis will differ from that of the Debtors and that avoidance actions will be commenced against Creditors of the estate, insiders, or others.

## XI.     LITIGATION

. On August 13, 2010, Capmark filed suit against Vintage Park in Harris County District Court, 190th Judicial District, alleging breach of contract and requesting an appointment of a receiver.   The parties reached a temporary agreement abating the appointment of a receiver Otherwise, no litigation is pending or threatened against the Debtors.  No claim of environmental liability has been made, and no such claims are known or expected.

## XII.     MANAGEMENT OF THE REORGANIZED DEBTOR

### A.  Directors of the Debtors

The Directors and Officers of the Debtors are Guy Savage and G.J. Willem Noltes. These Directors and Officers of the Debtors shall continue as Directors and Officers of the Reorganized Debtors from and after the Effective Date of the Plan.

### B.  Management Compensation

The officers and directors of the Debtors receive no direct compensation.  However, as stated above, the management company, Investment Realty, LLC will begin receiving management fees upon the Effective Date equal to 4% of gross monthly rents.  Investment Realty, LLC is owned by Mr. Savage and Mr. Noltes.

## XIII.   ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.  Acceptance of the Plan

Confirmation of a Plan under Chapter 11 requires, among other things, that at least one class of creditors or claimants, such as the secured or unsecured creditors in this case, vote in favor of the Plan.   This vote is calculated by only counting those creditors who actually send in a ballot on time.  If two thirds in total dollar amount and a majority in number of claims actually voting in a class approve the Plan, that class of creditors is considered an accepting class.  If the vote is insufficient, the Court can still confirm the Plan, but only upon being provided additional proof regarding the ultimate fairness of the Plan to the creditors.  The Debtors believe that the unsecured creditors will support the Plan when they consider the fact that the secured and priority creditors will receive the majority of all of the assets of the Debtors in the event the reorganization is unsuccessful.

The proponent of a Plan also must meet all other applicable requirements of Section 1129(a) of the Bankruptcy code (except Section 1129(a)(8), if the proponent proposes to seek confirmation of a Plan under Section 1129(b) of the Bankruptcy Code).   These other requirements include, among other things, that the Plan comply with the applicable provisions of Title 11 and other applicable law, that the Plan be proposed in good faith, and that at least one impaired class of creditors vote to accept the Plan.  The Debtors believe that the Plan satisfies all other applicable requirements of Section 1129(a) of the Bankruptcy Code.

### B.  Confirmation without Acceptance of All Impaired Classes

The Bankruptcy Court may confirm a plan even if not all impaired classes accept the Plan.  For the Plan to be confirmed over the rejection of an impaired class, the proponent must show, among other things, that the plan does not discriminate unfairly and that the plan is fair and equitable with respect to each impaired class that has not accepted the plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class if, among other things, the plan provides:  (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain, on account of its claim, property that has a value as of the Effective Date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and interests, that the holder of any claim or interest that is junior to the claims or interest of such class will not receive or retain, on account of such junior claim or interest, any property unless the senior class is paid in full.  The Bankruptcy Court must further find that the economic terms of a plan do not unfairly discriminate as provided in Section 1129(b) of the Bankruptcy Code with respect to the particular objecting class.

**THE DEBTORS BELIEVE THAT THE PLAN HAS BEEN STRUCTURED SO THAT IT WILL SATISFY THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AND CAN BE CONFIRMED OVER THE REJECTION OF THE PLAN BY SECURED CREDITORS, IF A CRAMDOWN IS REQUESTED.    THE DEBTORS BELIEVE THAT THE UNSECURED CREDITORS WILL SUPPORT THE PLAN SINCE THE ALTERNATIVE, LIQUIDATION, WILL LIKELY PAY SECURED CREDITORS THE MAJORITY OF THE ESTATES' ASSETS, LEAVING LITTLE OR NO RETURN TO UNSECURED CREDITORS.**

### C.  Other Requirements for Confirmation

In order to obtain confirmation of the Plan, the requirements of Section 1129 of the Code must be satisfied.  These requirements include but are not limited to findings that the Plan complies with the applicable provisions of Chapter 11 of the Code, that the Debtors have complied with the applicable provisions of Chapter 11 of the Code, that the Plan has been proposed in good faith and not by any means forbidden by law, and at least one class of impaired claims has voted to accept the Plan.  The Debtors believe that the Plan satisfies all the statutory requirement of Chapter 11 of the Bankruptcy Code.

#### 1. BEST INTEREST OF CREDITORS

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each class, that each holder of a claim or interest of such class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date, that is not less than the amount that such person would receive or retain if the Debtors were, on the effective date, liquidated under Chapter 7 of the Bankruptcy Code.  As set forth above, the Debtors believe that this test will be satisfied.

#### 2. FINANCIAL FEASIBILITY

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the bankruptcy court, the bankruptcy court must determine that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.  The Debtors believe that they will be able to fulfill their obligations under the Plan.

Attached hereto as Exhibit C is the Debtors' projection demonstrating the feasibility of the Plan. Exhibit C was prepared by Debtors' management from historical data and a projection model that assumes that revenue will be produced as projected by use of the current facilities and equipment.  The Debtors believe that they are sufficient to support additional business and will continue to increase its revenues.  This pro forma indicates that the Debtors will be able to survive on a post-confirmation basis.

To the extent revenue of the Debtors is insufficient to fund the payments on the Effective Date, the Tax Refund and Exit Facility will be used to fund the Plan.

### D. **Cram-Down - Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Code contains provisions for confirmation of a Plan even if the Plan is not accepted by all impaired classes, provided that at least one impaired class of claims has accepted it (determined without including any acceptance by any insider holding a claim of such class). These "cram-down" provisions, for confirmation of a Plan despite the non-acceptance of one or more impaired classes of claims or interests, are set forth in Section 1129(b) of the Bankruptcy Code.

In the event that any impaired class of claims does not accept the Plan by the requisite majority set out in the introduction, the Debtor must demonstrate to the Bankruptcy Court, with respect to each impaired class which does not accept the Plan that the Plan does not discriminate unfairly, and is "fair and equitable" with respect to that class. Under the Bankruptcy Code, a Plan is considered "fair and equitable" with respect to secured claims, unsecured claims or interest, as the case may be, if the following conditions are met:

     (a)   <u>Secured Claims</u>.  The holders of such claims retain their liens, to the extent of the allowed amount of their secured claims, and that each holder of such a claim receive on account of such secured claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in the collateral.

     (b)   <u>Unsecured Claims</u>.  Either (i) each impaired unsecured creditor receives or retains under the Plan property of a value as of the effective date of the Plan equal to the amount of its allowed claim, or (ii) the holder of any claim or interest that is junior to the claims of the dissenting class will not receive or retain any property under the Plan.

The Debtors believes that the Plan meets the "fair and equitable" test and does not discriminate unfairly with respect to any class of creditors or interest holders. Therefore, the Plan may be confirmed, even if it is rejected by the holders of allowed claims and interests.

## XIV.  **CONCLUSION**

The information provided in this Disclosure Statement is intended to assist you in voting on the Plan in an informed fashion. If the Plan is confirmed, you will be bound by its terms. Accordingly, you are urged to make such further inquiries as you may deem appropriate and then cast an informed vote on the Plan.

Respectfully submitted this 5TH day of November, 2010.

**IRH VINTAGE PARK PARTNERS, LP**

By:_____
        G.J. Willem Noltes

**VPI GENERAL PARTNER, LLC**

By:_____
        G.J. Willem Noltes

**VINTAGE PARK INVESTMENTS, LLC**

By:_____
        G.J. Willem Noltes

EDWARD L. ROTHBERG
State Bar No. 17313990
MELISSA A. HASELDEN
State Bar No. 00794778
T. JOSH JUDD
State Bar No. 24036866
5847 San Felipe, Suite 2200
Houston, Texas 77057
Telephone: 713.977.8686
Facsimile:  713.977.5395

ATTORNEYS FOR DEBTORS