## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **IRH VINTAGE PARK PARTNERS,** | § | **CASE NO. 10-37503-H4-11** |
| **LP, A GEORGIA LIMITED PARTNERSHIP** | § | |
| | § | |
| **VPI GENERAL PARTNER, LLC A** | § | |
| **DELAWARE LIMITED LIABILITY** | § | **CASE NO. 10-37508-H4-11** |
| **COMPANY** | § | |
| | § | |
| **VINTAGE PARK INVESTMENTS, LLC A** | § | **CASE NO. 10-37511-H5-11** |
| **GEORGIA LIMITED LIABILITY** | § | |
| **COMPANY** | § | |
| | § | |
| **Debtors.** | § | **(Chapter 11)** |
| | § | |

**Jointly Administered Under Case
No. 10-37503-H4-11**

### CAPMARK BANK'S OBJECTION TO CONFIRMATION OF PLAN

Capmark Bank ("Capmark"), a Utah industrial bank, a secured creditor herein to IRH Vintage Park Partners, LP ("Debtor"), objects to the confirmation of Debtors' Joint Chapter 11 Plan of Reorganization [Doc. 68] filed on November 5, 2010, including the Modifications to Debtors' Joint Chapter 11 Plan of Reorganization [Doc. 110] filed on December 22, 2010 (collectively, the "Plan"), and respectfully states as follows:

### INTRODUCTORY STATEMENT

This is a single asset real estate case. The Debtor and its finances were structured with Capmark pre-petition to make it a "bankruptcy remote entity." In particular, the Debtor's principals executed a Guaranty agreement which would "spring to life" if they caused the Debtor to file a bankruptcy proceeding. They did just that and now they are seeking to use this chapter 11 case to change the rules of the game midstream. Without filing for bankruptcy themselves, they are attempting to use the Debtor's Plan to shield themselves from the consequences of their

Guaranty.  This is improper under the law.  Therefore, confirmation of the Plan should be denied for this and the other reasons set forth below.

## PROCEDURAL HISTORY

1.      The Debtor along with its two equity partners filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") on September 2, 2010 ("Petition Date").   The three cases have been consolidated administratively, but not substantively.   The Debtor owns a single asset, an apartment complex (the "Property") and continues to operate and manage the Property as a debtor-in-possession.  The Debtor's equity partners own nothing other than their equity interests in the Debtor.

2.      The Court's Order Approving First Amended Joint Disclosure Statement, Authorizing Debtor to Solicit Votes and Setting Confirmation Hearing [Doc. 91] set January 24, 2011, as the last day for filing and serving objections to confirmation of the Plan.

## FACTUAL BACKGROUND

3.      The Property is a 324-unit apartment community located at 15727 Cutten Road, Houston, Texas 77070.

4.      In order to acquire the Property, the Debtor obtained purchase money financing from Capmark.  That financing was structured as a short-term, three year, non-recourse loan. The Debtor understood and agreed that it would be required to sell or refinance the Property upon maturity of the loan.

5.      On or about July 9, 2007, the Debtor entered into a Loan Agreement for the benefit of Capmark, as modified by that certain Modification Agreement ("First Modification Agreement") dated June 18, 2009, and as further evidenced and modified by that certain Second

Loan Modification Agreement ("<u>Second Modification Agreement</u>") dated January 8, 2010, all of which were executed by the Debtor and Capmark (collectively, the "<u>Loan Agreement</u>").

6. The Loan Agreement was executed in connection with a loan (the "<u>Loan</u>") evidenced by:

 (i) Promissory Note (Note A) ("<u>Note A</u>") dated July 9, 2007, executed by Borrower payable to the order of Lender, in the original stated principal amount of Thirty-Seven Million Seven Hundred Fifty Thousand and No/100 Dollars ($37,750,000.00), and

 (ii) Promissory Note (Note B) ("<u>Note B</u>") dated July 9, 2007, executed by Borrower payable to the order of Lender, in the original stated principal amount of Three Million Two Hundred Fifty Thousand and No/100 Dollars ($3,250,000.00) (Note A and Note B collectively, the "Note").

7. The Loan is secured by, among other instruments,

 (i) a Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (the "<u>Deed of Trust</u>"), dated July 9, 2007, executed by Borrower for the benefit of Lender, and covering the real and personal property more particularly described therein, commonly known as Vintage Park Apartments and located at 15727 Cutten Road, Houston, Texs 77070 in Harris County, Texas (as more fully defined in the Deed of Trust, the "<u>Property</u>"), recorded as Instrument Number 20070419276 of the Real Property Records of Harris County, Texas; and

 (ii) an Assignment of Leases and Rents (the "<u>Assignment</u>"), dated July 9, 2007, executed by Borrower for the benefit of Capmark, recorded as Instrument Number 20070419277 of the Real Property Records of Harris County, Texas.

8. Although the Loan was non-recourse, the Debtor's three principals, Guy Savage, G.J. Willem Noltes and David A. Brannen, all executed a "springing guaranty" in favor of Capmark. Those principals (the "<u>Guarantors</u>") agreed that if, among other things, they caused the Debtor to file a bankruptcy case, they would become liable immediately and jointly and severally, for the unpaid obligations due to Capmark under the loan. The Guarantors would be

required to pay off the Capmark Loan and, in essence, step into the shoes of Capmark as lender. The Debtor would be unaffected by such a transaction.

9.     The Loan was documented appropriately and Capmark's claim in this case has not been objected to by the Debtor.

10.     Capmark holds a valid and perfected and unopposed pre-petition deed of trust and security interest in and to the Property, and to all of the rents, revenues, issues and profits therefrom.

11.     The Loan Agreement, Note A, Note B, Deed of Trust, Assignment, and all other documents and instruments securing or evidencing the Loan are hereinafter, collectively, referred to as the "Loan Documents."  Further, copies of the Note A, Note B, the Deed of Trust, and Assignment are attached to Capmark Bank's Motion to Lift Stay [Doc. No. 128] and its Proof of Claim [Claim No. 7] on file with the Court.

12.     As of the Petition Date (September 2, 2010), the amounts owed on Note A and B [Claim No. 17] were as follows:

**Note A:**  (XXXXX7240)

| | |
|---|---|
| Principal | $37,750,000.00 |
| Interest due at non-default rate | $517,751.74 |
| 06/15/10 through 09/01/10 | |
| Exit Fee (0.5%) | $188,750.00 |
| Custodial & Administrative Expenses | $310.00 |
| Account & Deferred Unpaid Billings | $100.00 |
| Additional Default Interest | $288,368.06 |
| (additional 5% above non-default rate) | |
| 07/09/10 through 09/01/10 | |
| Outstanding Late Charges | $90,115.02____ |
| Total | $38,835,394.82 |

**Note B**: (XXXXX7241)

| | |
|---|---|
| Principal | $3,182,481.79 |
| Interest due at non-default rate | $43,648.62 |
| 06/15/10 through 09/01/10 | |
| Exit Fee (0.5%) | $16,250.00 |

| | |
|---|---|
| Custodial & Administrative Expenses | $310.00 |
| Account & Deferred Unpaid Billings | $100.00 |
| Additional Default Interest | $24,310.62 |
| (additional 5% above non-default rate) | |
| 07/09/10 through 09/01/10 | |
| Outstanding Late Charges | $4,226.74 |
| Total | $3,271,327.77 |
| | |
| Pre-petition attorneys fees | $22,774.47 |
| Pre-foreclosure and pre-petition | $2,100.00 |
| Phase 1 | |

**TOTAL as of Petition Filing -**          **$42,131,597.06**

## SPECIFIC OBJECTIONS TO PLAN

13.     First, the Debtor's Plan impermissibly proposes to enjoin any actions by Capmark or any other creditor against any non-debtor Guarantors during the life of the Plan, in violation of 11 U.S.C. § 524(e).  The injunction proposed by the Debtor's plan is both procedurally improper, because it was not raised through an adversary proceeding, as required under Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 7001, and substantively improper because the Debtor cannot satisfy the applicable injunction standards.

14.     Second, Capmark submits that the Debtor has improperly gerrymandered the claims unsecured creditors into three separate classes (Classes 3, 4 and 7), and artificially impaired two of those classes (Classes 3 and 7), in an effort to comply with 11 U.S.C. § 1129(a)(8)(A) and, therefore, afford itself the benefits of 11 U.S.C. § 1129(b) to "cram down" the dissenting votes of Capmark in Classes 2 and 4 of the Plan.

15.     Third, the Debtor's Plan fails to provide Capmark with the appropriate rate of interest on both its secured and unsecured claims thereby depriving Capmark of the present value of its secured and unsecured claims.

16.     Fourth, the Debtor's Plan was not proposed in good faith under Bankruptcy Code § 1129(a)(3).  Although the term "good faith" is not defined in the Code, it has been construed to mean "honesty in purpose" and full disclosure of relevant facts.  The Debtors have proposed the Plan in bad faith primarily to benefit the Equity Holders who have executed guarantees in favor of Capmark.  One method the Debtor has proposed for protecting those Insiders is to attempt to use the "new value exception" to the absolute priority rule embodied in 11 U.S.C. § 1129(b).  Another method the Debtor has proposed for protecting those Insiders is to release the Equity Holders/Insiders and to enjoin Capmark from prosecuting its guarantee claims against them.  Capmark submits that there is no business justification and/or benefit to the Debtor for these provisions and that, therefore, they are proposed in bad faith solely to benefit the Insiders.

17.     Fifth, Debtor's Plan does not comply with Bankruptcy Code § 1129(a)(11).   The Debtor's Plan is not feasible.  In addition, the Debtors' management of the Property has been substandard as compared to comparable properties in its market area.

18.     Debtor provides Class 6 as an "Allowed Senior Secured Claims of Mechanic and Materialmen" that are determined by the Debtor to be senior to the Class 2 Claim, which is Capmark Bank's secured claim.  Hamilton-Steele, LLC, asserts a perfected and secured proof of claim in the amount of $12,413.82, providing that it is a secured claim as to the real estate.  According to the documentation attached to the claim, the invoice reads that it is for monthly landscape maintenance and color installation in May and June 2010.  Texas law is clear that, assuming Hamilton-Steele holds a perfected and secured claim as it asserts, Hamilton-Steele's claim is superior to Capmark Bank's deed of trust *only* as to the removables.  That is, a perfected mechanic's and materialman's lien is granted a preference over all other liens on improvements that can be removed without material injury to the land, pre-existing improvements, or

improvements to be removed from the structure.  Tex. Prop. Code § 53.123; *First Nat'l Bank v. Whirlpool Corp.*, 517 S.W.2d 262 (Tex. 1974).  Given the description of the services performed by Hamilton-Steele, LLC, in its claim, it does not appear that there are any removables.  Accordingly, this claim should not take priority over Capmark Bank's secured and perfected claim.

## ARGUMENT

**I.      The Plan Violates 11 U.S.C. § 524(e).**

**A.      The Injunctive Relief Provided in the Plan Is Not Proper Because It Was Not Brought By  Adversary Proceeding as Required Under Rule 7001.**

19.      Section 13 of the Plan enjoins Capmark from asserting its state court suit, or otherwise pursing its contractual rights against the Guarantors for a period of seven (7) years, the life of the Plan.  In particular, the Plan provides:

> 13.7    Releases.  On the Effective Date and pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, the Debtors, and to the maximum extent provided by law, their agents, release and forever discharge all claims, including acts taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implantation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into or any other act taken or entitled to be taken in connection with the Plan or this case against the following whether known or unknown:

> 13.7.1 Guy Savage, G.J. Willem Noltes and David A. Brannen and all other officers and equity holders of the Debtors. ("Insider Released Parties"), in connection with any and all claims and causes of action arising on or before the Confirmation Date that may be asserted by or on behalf of the Debtors or the Bankruptcy Estates and/or on account of the Debtors' Cases.  The release of these Insider Released Parties shall be conditioned upon the occurrence of the Effective Date.

> 13.8    Guarantors. Nothing herein shall be deemed to release the liability of any non-debtor guarantor to a Creditor; provided, however, that so long as the Debtors are current with respect to all of their obligations under this Plan and the Confirmation Order

> Creditors may not pursue collection of their Claims from any guarantor. If the Debtors commit an uncured default in their obligations hereunder, then and only then may Creditors seek relief against guarantors.

20.     However, Bankruptcy Rule 7001 requires that injunctive relief, such as that contained in Sections 13.7 and 13.8, may be obtained only be means of an adversary proceeding:

> An adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings:
>
> (1) to recover money or property, except a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of the Code, Rule 2017, or Rule 6002,
>
> (2) to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d),
>
> (3) to obtain approval pursuant to § 363(h) for the sale of both the interest of the estate and of a co-owner in property,
>
> (4) a proceeding to object to or revoke a discharge, other than an objection to discharge under §§ 727(a)(8), (a)(9), or 1328(f);
>
> (5) to revoke an order of confirmation of a chapter 11, chapter 12, or chapter 13 plan,
>
> (6) to determine the dischargeability of a debt,
>
> (7) to obtain an injunction or other equitable relief,
>
> (8) to subordinate any allowed claim or interest, except when subordination is provided in a chapter 9, 11, 12, or 13 plan,
>
> (9) to obtain a declaratory judgment relating to any of the foregoing, or
>
> (10) to determine a claim or cause of action removed pursuant to 28 U.S.C. § 1452.

Fed. R. Bankr. Proc. 7001.

21.     The Fifth Circuit has held, unequivocally, that an adversary is required to obtain an injunction, stating that under Rule 7001, an injunction requires an adversary proceeding. *Matter of Zale Corp.*, 62 F.3d 746, 762 (5th Cir. 1995); *In re Harbor Oil, Co.,* 92 F.3d 426, 437 (5th Cir. 1994). Moreover, injunctive relief cannot simply be added as part of a plan of

reorganization.  *Zale*, 62 F.3d at 763 (citing *In re Commercial Western Financial Corp.,* 761 F.2d 1329, 1337 (9th Cir. 1985); *In re McKay*, 732 F.2d 44, 48 (3rd Cir. 1984) (holding that party cannot include a Rule 7001 matter in reorganization plan, but must file an adversary proceeding to resolve the matter with the bankruptcy court).

22.     Because the Debtor failed to comply with Bankruptcy Rule 7001, the injunctive relief requested in Sections 13.7 and 13.8 cannot be granted.  Therefore, confirmation of the Plan is improper and must be denied.

**B.     The Injunctive Relief Contained in the Plan Impermissibly Affects the Liability of Non-Debtors to Capmark in Violation of 11 U.S.C. § 524(e).**

23.     Even assuming, *arguendo*, that the injunction contained in the Sections 13.7 and 13.8 could be raised outside of an adversary proceeding, the injunction included in the Plan violates 11 U.S.C. § 524(e) because it seeks to affect the liability of non-debtors, such that the Plan does not comply with 11 U.S.C. § 1129(a)(2) and cannot be confirmed.

24.     The Fifth Circuit has held, consistently, that 11 U.S.C. § 524(e) releases and affects only the liability a bankruptcy debtor and does not release or affect the liability of non-debtor third parties.  *In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009); (*In re Coho Resources, Inc.* 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Zale Corp.*, 62 F.3d 746 (5th Cir. 1995); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993).  These cases are based on the fact that § 524(e) provides a fresh start solely to debtors and do not provide similar relief to non-debtors.  *In re Bigler LP*, 2010 WL 4878738, at *3 (Bankr. S.D. Tex. Nov. 24, 2010) (citing *Pacific Lumber*, 584 F.3d at 252-53).

25.     Sections 13.7 and 13.8 of the Plan do not propose to release or discharge permanently the liabilities of the non-debtor Guarantors.  Instead, it provides a seven year injunction on Capmark's ability to enforce its rights under the Guaranties against the Guarantors.

"[W]hile a temporary stay prohibiting a creditor's suit against a nondebtor . . . during the bankruptcy proceeding may be permissible to facilitate the reorganization process in accord with the broad approach to nondebtor stays under section 105(a) . . . the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor.  Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any countervailing justification of debtor protection . . ."  *Matter of Zale Corp.*, 62 F.3d at 760 (citing *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 601-02 (10th Cir. 1990).

26.     However, that provision within the Plan still violates 11 U.S.C. § 524(e) since it "affects" the liability of the Guarantors to Capmark.  Of course, the liability of a guarantor is "affected" regardless of whether it is released or, as in this case, stayed for a long period of time. *In re Davis Broadcasting, Inc.*, 176 B.R. 290, 292 (M.D. Ga. 1994).

## C.     The Debtor Has Not Satisfied the Test for Injunctive Relief.

27.     Assuming that the injunction does not violate Bankruptcy Rule 7001 or 11 U.S.C. § 524(e), which is denied, the injunction still cannot stand because the Debtor cannot meet four-part test for injunctive relief.  While the release of third parties in the Plan is not labeled as a permanent or temporary injunction, it has the same effect.  Therefore, the Debtor must meet the evidentiary burden to obtain an injunction.  *See In re Bernhard Steiner Pianos USA*, 292 B.R. 109, 118 (Bankr. N.D. Tex. 2002).  In order to obtain injunctive relief, the moving party must show: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause to the party opposing the injunction; and (4) that the granting of the injunction will not disserve the public interest.  *Id.*

28.     The Debtor has failed to satisfy the four-part test for injunctive relief.  First, the Debtor's Plan cannot be confirmed because it does not comply with 11 U.S.C. § 1129(a)(2), as it fails to comply with several provisions of the Bankruptcy Code, including 11 U.S.C. § 524(e). Second, the Debtor will not suffer any hardship if the injunction is not granted, as the injunction seeks to affect only the ability of a creditor to pursue causes of action against non-debtors. Third, Capmark will be irreparably injured if it is forced to delay pursing its rights against non-debtors, the Guarantors, for seven years.  Finally, the injunction would negatively affect the public interest by giving non-debtors a "get out of jail" free card for a period of seven years, in contravention of 11 U.S.C. § 524(e).  Therefore, because the foregoing factors have not been, and cannot be, met, the injunction provided for in the Plan is not proper.

### D.     No "Unusual Circumstances" Exist To Justify a Temporary Injunction.

29.     While the Fifth Circuit has held that a post-confirmation permanent injunction that effectively releases a non-debtor from liability is improper, that impropriety does not necessarily extend to a temporary injunction of actions against non-debtors.  *Matter of Zale Corp.*, 62 F.3d at 760; *Bernhard Steiner Pianos*, 292 B.R. at 116.  The *Zale* court stated that a temporary injunction may be proper under "unusual circumstances."  *Id.* (citing *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993); *Teachers Ins. & Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986)); *see also In re Seatco, Inc.*, 257 B.R. 469, 477 (Bankr. N.D. Tex. 2001) (stating that circumstances may arise in a bankruptcy case warranting the issuance of a temporary injunction of third party actions as a part of confirmation).   Those unusual circumstances include: (1) when the non-debtor and the debtor enjoy such an identity of interests that the suit against the non-debtor is essentially a suit against the debtor, and (2) when the third party action will have an adverse impact on the debtor's ability to accomplish reorganization.  *Id.* If there are no unusual circumstances, a bankruptcy court *may not* enjoin a third party action.  *Id.*

30.     As noted above, the Debtor has failed to satisfy the four-part test for injunctive relief.  Therefore, it is not proper to impose any such relief as part of the confirmation of the Plan in this matter.  However, assuming that the Court finds grounds for the issuance of an injunction (which grounds are denied), Capmark asserts that there are no unusual circumstances which would justify the temporary injunction contained in the Plan, in favor of the Guarantors.  First, the Debtor and the non-debtor Guarantors are separate and distinct and do not share an identity of interests.  Thus, any suit against the Guarantors would not affect or impact the Debtor in any way.  Second, any action that Capmark may pursue against the Guarantors under the Guaranty will not affect or adversely impact the Debtor or its reorganization.  Because the Debtor and the Guarantors are separate and distinct, a suit by Capmark against the Guarantors under the Guaranty would not in any way impede the successful reorganization of the Debtor.  Therefore, because the test for injunctive relief has not been met, and because no unusual circumstances exist, the injunction in favor of non-debtors contained in the Plan cannot be approved.

E.     **Because Capmark Has Objected to the Release Contained in the Plan; the Plan Cannot Be Confirmed.**

31.     A bankruptcy court cannot confirm a chapter 11 plan of reorganization over a creditor's objection if the plan contains provision that violates § 524(e).  11 U.S.C. § 1129(a)(3); *In re New Towne Development, LLC*, 410 B.R. 225, 230-31 (Bankr. M.D. La. 2009) (citing *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987)); *see also In re Wool Growers Central Storage Co.*, 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007) (stating that a non-debtor release violates Section 524(e) when the affected creditor timely objects to the provision); *Bernhard Steiner Pianos*, 292 B.R. at 116 (holding that a plan that releases a non-debtor could not be confirmed over creditor objections).  Capmark has objected to the Plan because, among

other things, it provides a seven-year release to the Guarantors in violation of 11 U.S.C. § 524(e).

For this reason alone, the Court cannot confirm the Plan.

## II.    The Plan Artificially Impairs Class 3.

### A.    Impairment Under the Bankruptcy Code

32.    Impairment is discussed in 11 U.S.C. § 1124, which provides that:

> Except as provided in section 1123(a)(4) of this title, a class of claims or interest is impaired under a plan unless, with respect to each claim or interest of such class, the plan-
>
> (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;
>
> (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default-
>
>> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;
>>
>> (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
>>
>> (C) compensates the holder of such claims or interest of any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and
>>
>> (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1122.

33.    The Bankruptcy Code creates a presumption of impairment to enable a creditor to vote on acceptance of the plan.  *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 203 (3d Cir. 2003) (citing *In re Monclova Care Ctr., Inc.*, 254 B.R. 167, 178-79) (Bankr. N.D. Ohio 2000); *In*

*re Seasons Apartments, L.P.*, 215 B.R. 953, 958 (Bankr. W.D. La. 1997)).   Therefore, to overcome the presumption of impairment, the debtor must demonstrate that the plan leaves the creditor's rights unaltered by meeting the exceptions provided in either 11 U.S.C. § 1122(1) or (2). *Id.*

34.     Generally, a class is impaired when the legal, equitable and contractual rights out of which the creditor's claim arises are altered *in any way*.  *In re G.L. Bryan Investments, Inc.*, 340 B.R. 386, 390 (Bankr. D. Colo. 2006) (emphasis added).   Whether a claim is impaired or unimpaired is a question of law.  *Matter of Madison Hotel Assoc.*, 749 F.2d 410 (7th Cir. 1984); *In re L&J Anaheim Assoc.*, 995 F.2d 940, 942 (9th Cir. 1993).

35.     "Impairment" is a term of art that was crafted by Congress to determine a creditor's standing at the plan confirmation stage.  *See In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197 (3d Cir. 2003); *In re L&J Anaheim Assoc.*, 995 F.2d 940 (9th Cir. 1993); *In re Temple Zion*, 125 B.R. 910 (Bankr. E.D. Pa. 1991).   "Impairment" extends beyond a worsening of a creditor or interest holder's position to include virtually any alteration of the rights of interested parties beyond those specifically designated as not affecting impairment.  *See L&J Anaheim Assoc.*, 995 F.2d at 942-43; *Temple Zion*, 125 B.R. at 912-14.   Any impairment, no matter how insignificant, renders the entire claim or interest impaired under the plan.  *See In re Witt*, 60 B.R. 556 (Bankr. N.D. Iowa 1986); *In re Wilhelm*, 101 B.R. 120 (Bankr. W.D. Mo. 1989). Furthermore, any change to a creditor's rights, whether for better or worse, generally constitutes impairment.  *Matter of Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305 (7th Cir. 1995); *L&J Anaheim Assoc.*, 995 F.2d at 942-43; *In re Rhead*, 179 B.R. 169 (Bankr. D. Ariz. 1995).

36.     To determine whether a creditor's claim is "impaired," so as to give it standing to vote upon the confirmation of a proposed chapter 11 plan, the court must examine whether the

plan itself is the source of limitation on the creditor's legal, equitable, or contractual rights. *PPI Enterprises (U.S.), Inc.*, 324 F.3d at 204. A creditor's claim outside of bankruptcy is not a relevant barometer for whether a proposed chapter 11 plan impairs its rights, for purposes of deciding whether a creditor has right to vote on confirmation of plan. *Id.*

**B.    The Delay in Payment Under the Plan to Class 3 Constitutes an Impairment.**

37.    Several court have found that a delay in the payment of claims constitutes an impairment under 11 U.S.C. § 1122. In *In re Windsor on the River Assoc., Ltd.*, the plan proposed to pay a class of 34 unsecured trade claims totaling approximately $13,000.00 sixty (60) days after the effective date, despite having cash on hand at the effective date to pay the trade claims in full. 7 F.3d 127, 132 (8th Cir. 1993). The delay in payment was considered an impairment, which allowed the class of unsecured trade claims to vote on the plan proposed by the debtor. *Id.* The Eighth Circuit stated that the only purpose to be served by the delay in payment to the unsecured trade claims was to ensure approval by at least one impaired class as required by 11 U.S.C. § 1129(a)(10). *Id.* at 133.

38.    In *In re Duval Manor Assoc.*, the plan of the debtor, an apartment building owner, proposed to pay a class of security deposit claims in 2 installments. 191 B.R. 622, 627 (Bankr. E.D. Pa. 1996). The first installment would consist of one-half of the security deposit which would be paid when due under the Landlord and Tenant Code, and the second installment of the balance of the security deposit would be paid 30 days later. *Id.* The court found this delay in the full payment of the security deposit by 30 days represented an impairment sufficient to satisfy 11 U.S.C. § 1129(a)(10). *Id.*

39.    In *In re Hotel Assoc. of Tucson*, the plan proposed to pay a class of general unsecured claims in cash with interest at the prime rate, but delayed payment for a period of 30 days after the effective date despite having sufficient cash on hand at the effective date to pay the

class at that time.  165 B.R. 470, 473-74  (9th Cir. 1994).  The Court found this 30-day waiting period to be an impairment of the class under 11 U.S.C. § 1129(a)(10).  *Id.* at 474-75.

40.     Finally, in *In re Lettick Typografic, Inc.*, the plan proposed to pay a class consisting of one secured claim 15 days after the effective date. although all other secured creditors would be paid on the effective date.  103 B.R. 32, 33 (Bankr. D. Conn. 1989).  The Court found the slight delay in payment for this class to be an impairment under 11 U.S.C. § 1129(a)(10).  *Id.* at 38-39.  *See also Matter of Sandy Ridge Development Corp.*, 881 F.2d 1346, 1353 (5th Cir. 1989) (finding plan that proposed to pay class consisting of one claim of $2,500 within 30 days after confirmation of the plan to be, on its face, "technically impaired").

41.     The Debtor's Plan proposes to pay Class 3 "in full without interest on the later of *thirty (30) days after the Effective Date* or the date such Claims become Allowed Claims."  The 30 day delay in payment is the cause for the impairment of Class 3.  However, this impairment is artificial because the Debtor will have funds on hand at the Effective Date to pay the claims in Class 3, in full.  Accordingly, the Debtor has artificially impaired Class 3 so as to assure that an impaired class exists to vote in favor of confirmation of the Plan.

**C.      Class 3 is Entitled to Interest on Claims; Without Interest, the Claim is Impaired.**

42.     Pursuant to Texas law, open accounts are entitled to prejudgment interest, which starts to accrue on either (1) the 180th day after the defendant receives written notice of the plaintiff's claim, or (2) the day the suit is filed, whichever is earlier.  Tex. Fin. Code Section 304.104.

43.     The Plan does not provide for any interest to be paid on the claims included in Class 3.  This results in an impairment of the claims in Class 3, as the class members' legal right to collect interest on their claims has been altered by the Plan.  *See* 11 U.S.C. § 1124(1).  The

payment of interest under Texas law on the claims in Class 3 would increase the amount due to the class under the Plan by a minimal amount, creating little to no effect on the overall Plan. However, the Debtor has failed to do this.  Again, the Debtor has artificially impaired Class 3 so as to assure that an impaired class exists to vote in favor of confirmation of the Plan.

## III.    The Plan Gerrymanders the Unsecured Classes to Secure a Vote of the Impaired Class.

44.    The Plan provides for 3 classes of unsecured claims.  Class 3 includes allowed unsecured vendor claims of $2500.00 or less and provides for those claims to be paid in full without interest the later of 30 days after the Effective Date or when the claims become allowed claims.  Class 4 includes the allowed unsecured deficiency claims held by Capmark and allowed unsecured vendor claims in excess of $2500.  The Plan provides that the claims within Class 4 will be paid 10% of their allowed claim within 30 days of the Effective Date, plus unsecured promissory notes for the remaining full balance of the allowed claim.  *Id.*  Finally, Class 7 includes allowed claims of affiliates and provides for an offset of the claims against amounts owed by the Debtor and for the remaining balance owed to be subordinated until all claims in Classes 1 through 6 have been paid in full.

45.    The Bankruptcy Code provides for the classification of claims or interests as follows:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

46.     Therefore, according to 11 U.S.C. § 1122(a), "substantially similar" claims, or those which share common priority and rights against the debtor's estate, should be placed in the same class.  *See Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1278 (5th Cir. 1992).  The Fifth Circuit has made it clear that a debtor cannot "classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."  *Id.* at 1279; *Matter of Briscoe Enterprises, Ltd.*, 994 F.2d 1160, 1167 (5th Cir. 1993).  Therefore, while 11 U.S.C. § 1122(a) permits classification of substantially similar claims in different classes, that classification can only be undertaken for "reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims."  *Matter of Greystone*, 995 F.2d at 1278; *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001); *In re Pisces Energy, LLC*, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009).

47.     Section 1122(b) provides an exception to the general rule that all substantially similar claims must be classified together in that it permits small unsecured claims to be classified separately from their larger counterparts for administrative convenience, if approved by the court.  *Greystone*, at 1278-79; *see also In re Northwest Timberline Enterprises, Inc.*, 348 B.R. 412, 438 (Bankr. N.D. Tex. 2006) (stating that "[t]he creation of an administrative convenience class is not merely a matter of showing that there are a group of small claims that could be nicely segregated; rather, the debtor must show that it is reasonable and necessary to create a separate class and that it is 'something more than just tending to ease the administrative burden.'") (citing *In re Way Apartments*, 201 B.R. 444, 452 (N.D. Tex. 1996)).

48.     Here, the Debtor has created 3 classes of unsecured creditors, with little to no justification for the separate classification of these unsecured creditors.  At most, Class 3 may be categorized by the Debtor as an administrative convenience class under 11 U.S.C. § 1122(b).

This leaves Class 4, which contains vendor claims over $2500 and Capmark's unsecured deficiency claim, and Class 7, which contains affiliate unsecured claims. The claims arising under Classes 4 and 7 are all substantially similar in that they are all unsecured pre-petition debts owed by the Debtor, which share common priority and rights against the Debtor's estate.

49.     The Fifth Circuit has noted that there may, in certain narrow circumstances, be good business reasons justifying the separate classification of an unsecured deficiency claim from other general unsecured creditors. *Matter of Greystone*, 995 F.2d at 1279-81; *Matter of Briscoe Enterprises, Ltd.*, 994 F.2d 1160, 1166-67 (5th Cir. 1993) (emphasizing narrowness of its holding that separation of unsecured claims was justified); *In re Northwest Timberline Enterprises, Inc.*, 348 B.R. 412, 438 (Bankr. N.D. Tex. 2006). Whether there is any good business reason to support a debtor's separate classification is a question of fact. *Matter of Greystone*, 995 F.2d at 1281 n.7. Here, there is simply no justification for separately classifying the unsecured deficiency claim of Capmark and the unsecured affiliate claims. Moreover, the Debtor can provide the Court with no good business reason for the separate classification. Therefore, the Court should find that the current classification contained in the Plan is an attempt to gerrymander an affirmative vote of an impaired class in favor of the Plan in contravention of the Bankruptcy Code and Fifth Circuit jurisprudence.

**IV.     The Plan Fails to Provide the Appropriate Amount of Interest on Capmark's Claims.**

   **A.     The Plan Understates the Interest Due on Capmark's Secured Claim.**

50.     The Plan proposes to pay interest on Capmark's secured claim at the prime rate plus seventy-five basis points or .75%. *See* P. 17 of Debtor's Plan.[1] This rate of interest fails to

---

[1] The Plan also provides for a negative amortization of the Capmark loan. In *In re M&S Associates, Ltd.*, the plan provided for negative amortization or a deferral of interest on the secured creditor's claim. 138 B.R. 845, 850 (Bankr. W.D. Tex. 1992). The court noted that "[a] reorganization plan which provides for negative

provide Capmark with the present value of its secured claim.  If a chapter 11 plan proposes payment of an interest rate below the "range of prevailing market rates for loans of comparable risk and duration" or which does not take into account the actual risk of that loan, confirmation must be denied because the deferred payments will not yield the present value of the claim and, therefore, the plan is not fair and equitable.  *In re Seasons Partners, LLC*, 2010 WL 4386939, at *8 (Bankr. D. Ariz. Oct. 28, 2010) (citing *In re One Times Square Associates Ltd. P'ship*, 159 B.R. 695, 706 (Bankr. S.D.N.Y. 1993)).

51.     The Fifth Circuit has declined to establish a particular formula for determining an appropriate cramdown interest rate.  *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 800 (5th Cir. 1997).   Instead, courts must use a wide variety of different rates as benchmarks in computing the appropriate interest rate for the specific risk level in the case.  *Id.* (citing *In re Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1169 (5th Cir. 1993)).  A significant objective of a bankruptcy court when determining an appropriate rate of cram down interest is to arrive at a rate of interest that "reflects the present value of the [creditor's] claim and accounts for the specific level of risk."  *In re SJT Ventures*, 2010 WL 3342206, at *6 (Bankr. N.D. Tex. Aug. 25, 2010) (citing *T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997)); s*ee also Good v. RMR Investments, Inc.*, 428 B.R. 249, 254 (E.D. Tex. 2010) (stating that in the Fifth Circuit, courts considering cramdown interest in cases involving insolvent debtors have applied the contractual rate as the appropriate rate of interest) (citing *T-H New Orleans*, 116 F.3d at 800; *Briscoe*, 994 F.2d at 1169 (noting "[n]umerous courts have chosen the contract rate if it seemed to be a good estimate as to the appropriate discount rate"); *In re Sylvan I-30 Enterprises*, 2006 WL 2539718,

---

amortization is not *per se* inequitable and a bar to confirmation, but may be highly suspect.  *Id.* (citing *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174 (9th Cir. 1992); *In re D & F Constr.*, 865 F.2d 673, 676 (5th Cir. 1989); *Club Associates*< 107 B.R. at 398; *In re Century Inv. Fund VII Ltd.*, 96 B.R. 884, 891 (Banks. E.D. Wis. 1989); *In re Anderson Oaks (Phase I) Ltd.*, 77 B.R. 108 (Bankr. W.D. Tex. 1987)).

at *7 (Bankr. N.D. Tex. Sept. 1, 2006) (unpublished) (applying contract rate because "[t]he interest rate required of the [d]ebtor prepetition is a fair measure of the market's assessment of the risk associated with dealing with the [d]ebtor")).

52.     In *Till v. SCS Credit Corp.*, the Supreme Court adopted a formula approach for calculating interest on secured claims in chapter 13 cases which started with national prime rate and added a risk premium based on the circumstances of the estate, the nature of the security and the duration and feasibility of the reorganization plan.  541 U.S. 465, 478-79 (2004).  The *Till* court acknowledged that a different analysis may be required in chapter 11 cases and that it may be appropriate for a court to determine the rate of interest in an "efficient" market.  *Id.* at 477 n.14.  *See also In re Mirant Corp.*, 334 B.R. 800, 822-23 (Bankr. N.D. Tex. 2005) (stating that a debtor's value, credit-worthiness and attractiveness as an investment must be objectively assessed as of the prospective effective date of a plan . . . this is done by taking a market-accepted risk-free interest rate or rate of return and adding to that a risk premium determined by the court based on the specific risks shown by the evidence and the market); *Seasons Partners*, 2010 WL 4386939, at *11 (noting that the interest rate determination is to be made on a case-by-case basis).

53.     Most recently, in *SJT Ventures*, the "market rate" was used to calculate the appropriate rate of post-confirmation interest in a chapter 11 plan for a debt secured by real property collateral held by an over-secured creditor.  2010 WL 3342206, at *2-4.  The interest calculation under this approach was based on the ordinary practices of commercial real estate lenders in the area.  *Id.* at *4.  The court found that this approach achieved "the Supreme Court's underlying purpose in *Till* of ensuring that secured creditors are compensated for the 'time value of their money and the risk of default' by way of an objective assessment, while at the same time

employing the on-the-ground insight of an effective market, where it exists." *Id.* at *7. The court confirmed the chapter 11 plan, which provided for interest on a $1.9 million loan, with a loan to value ratio of roughly 82%, at the daily 5-year Treasury Bill rate (which was 1.85% at the time of confirmation), plus 4.5%, for a total post-confirmation interest rate of 6.35%. *Id.* at *2, *7.[2]  However, the court noted that a "slimmer loan margin carries with in a higher risk to the creditor, and so rightly warrants an increase in interest." *Id.* at *7. *See also In re Prussia Associates*, 322 B.R. 572, 578-79, 590 (Bankr. E.D. Pa. 2005) (finding that appropriate risk factor to add to prime of 5.75% was 1.5% based on the fact that the debtor's operations were improving "apace" and the value of the secured creditor's collateral was steadily appreciating); *In re Seatco, Inc.*, 57 B.R. 469, 483-84 (Bankr. N.D. Tex. 2001) (stating that the prime rate plus 2%, adjusted annually and capped at 13.5%, included a risk premium sufficient to account for the fact that the secured creditor would not be paid in full on the effective date, but rather would receive deferred cash payments over the life of the plan).

54.     Unlike *SJT Ventures*, Capmark's secured claim under the Plan has a 100% loan to value ratio. *See In re Snider Farms, Inc.*, 83 B.R. 977, 998 (Bankr. N.D. Ind. 1988) (noting that when secondary lenders make 100% loans, a higher rate of interest is normally demanded; thus, the discount factor must reflect the risks inherent in such a loan to value ratio); *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 543-44 (Bankr. E.D. Tenn. 1997) (approving interest rate of Treasury Bill rate plus 1.99% for secured debt 100% loan to value ratio and noting that this rate was in line with rates upheld in other 100% loan to value ratio secured debt cases) (collecting other cases dealing with interest rates for 100% loan to value cases, *e.g., In re Overland Park*

---

[2] According to expert testimony provided by the debtor, the standard spread for a 30 year amortized loan of approximately $1.9 million with a 5 year balloon payment was 300 points, or 3.0% above the 5 year T-Bill rate where there exists a 65-70% loan to value ratio. *In re SJT Ventures*, 2010 WL 3342206, at *2. The debtor's secured debt has a loan to value of 82%, which required the incorporation of additional spreads points (150 points) to account for the increased risk of the higher loan to value ratio to represent the increased risk. *Id.*

*Merchandise Mart Partnership, L.P.,* 167 B.R. 647, 660 (Bankr. D. Kan. 1994) (approving interest of treasury bill rate plus 250 basis points); *In re Rivers End Apartments, Ltd.,* 167 B.R. 470, 485 (Bankr. S.D. Ohio 1994) (approving interest of treasury note plus 250 basis points); *In re Bloomingdale Partners,* 155 B.R. 961, 986 (Bankr. N.D. Ill. 1993) (allowing interest of treasury bond rate plus 325-350 basis points); *In re River Village Assocs.,* 161 B.R. 127, 139 (Bankr. E.D. Pa. 1993), *aff'd* 181 B.R. 795 (E.D. Pa. 1995) (allowing interest at treasury bill rate plus 3%); *In re IPC Atlanta Ltd. Partnership,* 142 B.R. 547, 558 (Bankr. N.D. Ga. 1992) (approving interest of treasury bond rate plus 3%); *In re Oaks Partners, Ltd.,* 135 B.R. 440, 447 (Bankr. N.D. Ga. 1991) (approving interest of treasury bill rate plus 3%); and *In re Aztec Co.,* 99 B.R. 388, 392 (Bankr. M.D. Tenn. 1989) (approving interest treasury bill plus 2%); *In re Woodmere Investors Ltd. P'ship,* 178 B.R. 346 (Bankr. S.D.N.Y. 1995) (concluding that due to the age of the debtor's building and the 100% loan to value ratio, 3.5% should be added to the applicable treasury rate note to compensate for risk rather than the 2.25% proposed by the debtor's plan); *In re Deep River Warehouse, Inc.,* 2005 WL 2319201, at *12 (Bankr. M.D.N.C. Sept. 22, 2005) (approving interest rate on secured claim of the ten-year treasury rate plus 155 basis points for non-recourse loan with 100% loan to value ratio); *Northwest Timberline Enterprises, Inc.,* 348 B.R. 412, 433 (Bankr. N.D. Tex. 2006) (finding that appropriate interest rate for a secured creditor on loan with a 100% loan to value ratio, no guaranties and an inferior lien position to another secured creditor was the prime rate plus 5.75%).

55.     The Plan undervalues the rate of interest due to Capmark on its secured claim.  As a result, the Plan does not provide Capmark with the present value of its secured claim as required under 11 U.S.C. § 1129(b)(2)(A)(i)(II).  According, the Plan cannot be confirmed.

**B.      The Plan Understates the Interest Due on Capmark's Unsecured Claim.**

56.      The Plan proposes to pay interest on Capmark's unsecured claim at the prime rate plus two hundred basis points or 2.0%.  *See* P. 17 of Debtor's Plan.  Section 726(a)(5) of Title 11, which provides unsecured creditor with post-petition interest at the "legal rate from the date of the filing of the petition," applies in chapter 11 cases through the best interests of the creditor test contained in 11 U.S.C. § 1129(a)(7)(A)(ii); *See In re Mirant Corp.*, 334 B.R. 800, 823-24 (stating that *Till* does not, as a matter of law, provide a specific range of interest rates requred to satisfy unsecured claims pursuant to 11 U.S.C. § 1129(b)(2)(B)(ii)).

57.      There is no uniformity in the case law as to what the term "legal rate" means, whether it be the federal judgment interest rate, the contract rate, etc.  *See In re Willauer*, 192 B.R. 796, 802 (Bankr. D. Mass. 1996) (applying interest at federal judgment rate to general unsecured claim in chapter 11 proceeding); *In re David Green Property Management*, 164 B.R. 92, 99 (Bankr. W.D. Mo. 1994)(stating that the legal rate of interest to be paid to holders of allowed unsecured claims before any proceeds are returned to a debtor is the federal judgment rate under 28 U.S.C. § 1961); *In re Schoeneberg*, 156 B.R.. 963, 971-72 (Bankr. W.D. Tex. 1993) (applying interest at the contract rate, based on the fact that "[t]he weight of historical case law nationally, as well as in this circuit, is that post-petition interest is payable either at the contract rate, at the statutory rate (if a specialized statute establishes a specialized rate of interest for a particular creditor) or, if there is no applicable statute and no rate was contracted for, at the state judgment rate."); *In re Dow Corning Corp.*, 456 F.3d 668, 678-80 (6th Cir. 2006) (allowing default contract rate of interest for unsecured claims against solvent debtor); *but see Cornwall Personal Ins. Agency, Inc.*, 308 B.R. 771, 776-77 (Bankr. N.D. Tex. 2003) (using the market approach discussed in *Briscoe*, which required the court to consider the appropriate risk premium

as determined by the market, factoring the length of the payout period, the quality of the security and the risk of subsequent default, to the current risk-free rate for similar loans, to determine that the appropriate rate of interest for the unsecured claim at issue was prime plus 1.5%, with a floor of 6%); *Westwook Plaza Apartments, Ltd.*, 255 B.R. 194, 196-98 (Bankr. E.D. Tex. 2000) (stating that "[i]t is obvious that the prevailing jurisprudence, especially in the Fifth Circuit, has determined that the best method for the courts to resolve . . . issues [related to the appropriate rate of cramdown interest] is to apply an appropriate market rate of interest to detemine the amount of the payments to be made to the secured or unsecured lender" and finding that the appropriate rate of interest for the unsecured claim was prime plus 2.5%).

58.     Accordingly, the proper rate of interest to be applied to Capmark's unsecured claim is either the contract rate, the federal judgment rate, or the market rate, rather than the amount stated in the Plan.

## V.     Absolute Priority Rule

59.     The absolute priority rule provides that a plan will be "fair and equitable" even if unsecured classes of creditors do not realize the full value of their claims, as long as no class junior to them receives or retains anything on account of their claims or interest. *See* 11 U.S.C. § 1129(b)(2)(B)(ii); *see also In re Dowden*, 143 B.R. 388, 391 (Bankr. W.D. La. 1989) (stating that the absolute priority rule, "in its simplest terms, requires that creditors of a debtor in bankruptcy reorganization receive payment of their claims in their established order of priority, and that they receive payment in full before lesser interests, such as those of equity holders, may share in the assets of the reorganized entity").

60.     Courts have recognized one exception to the absolute priority rule known as the "substantial contribution" or "new value" exception. *See In re Potter Material Serv.*, 781 F.2d

99, 1901 (7th Cir. 1986); *In re Future Energy Corp.*, 83 B.R. 470, 497 (Bankr. S.D. Ohio 1988). This exception was first discussed in *Case v. Los Angeles Lumber Products Co.*, in which the Supreme Court held that existing equity security holders can receive or retain interests in the reorganized debtor even though claims of senior creditors are not paid in full, if the equity security holders make a substantial contribution or investment in the reorganized debtor which equals or exceeds the value of the interest which they retain.  308 U.S. 106 (1939); *but see Dowden*, 143 B.R. at 395 (stating that the exception to the absolute priority rule under *Case* is narrow in scope and may be applied only when clearly applicable).

61.     Although there was some debate as to whether the new value exception remained after the creation of the Bankruptcy Code, the Ninth Circuit, in *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, held that the new value exception exists under the Bankruptcy Code.  2 F.3d 899 (9th Cir. 1993); *see also In re OCA, Inc.*, 357 B.R. 72 (Bankr. E.D. La. 2006) (stating that "the rationale employed by courts in continuing to accept the new value exception is that doing so helps to balance the two major policies of the Bankruptcy Code; preserving going concerns through reorganization and maximizing property available to satisfy creditors); *Southern Pacific Transportation Co. v. Voluntary Purchasing Groups, Inc.*, 252 B.R. 373 (E.D. Tex. 2000) (stating that the new value exception "operates on the premise that when an old equity holder retains its pre-petition interest in the reorganized debtor by meeting the four . . . requirements, the debtor is not retaining that interest 'on account of' its prior interest as proscribed by [11 U.S.C.] § 1129(b)(2)(B)(ii), but is instead participating in the reorganized debtor 'on account of' a new, substantial, necessary, and fair infusion of capital").

62.     Since *Bonner Mall P'ship*, numerous courts in the Fifth Circuit have found the new value exception to be valid under the current Bankruptcy Code.  *See In re Way Apartments*,

201 B.R. 444 (N.D. Tex. 1996) (holding that the post-petition contribution by the general and limited partners is allowed under the new value exception, which provides that when investors receive new equity in the property "on account of" their infusion of new value, their contribution and subsequent interest in the property would not violate the absolute priority rule); *In re Treasure Bay Corp.*, 212 B.R. 520 (Bankr. S.D. Miss. 1997) (finding that the proposed contribution was fair and equitable to satisfy the new value exception); *Southern Pacific Transportation Co.*, 252 B.R. at 389-90 (acknowledging existence of new value exception, but remanding due to lack of evidence in the record to determine whether the exception was met); *OCA, Inc.*, 357 B.R. at 89 (stating that '[o]f the few bankruptcy and district courts in the Fifth Circuit that have addressed the issue, all have held that there is a new value exception to the absolute priority rule . . . [a]lthough this court is not at all convinced that the Fifth Circuit would hold that a new value exception exists, for now the court will go along with the majority of the courts that have addressed the issue to date" and consider evidence on whether the new value exception should be recognized); *In re Cypresswood Land Partners, I*, 409 B.R. 396 (Bankr. S.D. Tex. 2009) (holding that the plan satisfied the requirements of the new value exception to the absolute priority rule).

63.    Most recently, in *In re Cypresswood Land Partners, I*, this Court discussed the elements of the new value exception to the absolute priority rule.  409 B.R. at 438.  For the new value exception to apply, there must be (1) a contribution that is new capital and substantial; (2) the contribution must be necessary for a successful reorganization; (3) the contribution must be in money or money's worth; and (4) the contribution must be reasonably equivalent to the value of the property received.  *Id.*; *see also OCA, Inc.*, 357 B.R. at 90; *Treasure Bay Corp.*, 212 B.R. at 544 (stating that "substantial" contribution is defined by the courts as not being a "gratuitous,

token cash infusion proposed primarily to buy cheap financing" and that the requirement that the contribution be reasonably equivalent to the value of the property received ensures that "the equity holders do not steal the company through self dealing"); *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725 (Bankr. E.D.N.Y. 1994) (stating that promises of future services or even of future payments do not constitute new value, guarantees also do not constitute new value because guarantees cannot be used as collateral or sold to raise money)  In the end, the court found that the case presented an appropriate factual basis for application of the new value exception. *Cypresswood Land Partners*, 409 B.R. at 440.

64.     In this case, the Debtor's Plan violates the absolute priority rule because it seeks to provide interest to the equity holders while other creditors will not receive the full value of their claims.  Moreover, while the equity holders propose to provide new value, through capital contributions to the Debtor, that new value does not rise to the level to meet the elements of the new value exception.  Therefore, the Plan violates 11 U.S.C. § 1129(b)(2)(B)(ii) and cannot be confirmed.

65.     Capmark reserves the right to further supplement this Objection.

THEREFORE, Capmark Bank respectfully prays that confirmation of Debtor's Plan be denied and that Capmark Bank have such other and further legal and equitable relief to which it is entitled.

Respectfully submitted, this 24th day of January, 2011.

Respectfully submitted,

By:___*/s/ Anne Marie Laney Hill*_____
JENNIFER L. DAVIS
Fed. Bar No. 7211/SBN 05508450
ANNE MARIE LANEY HILL
Fed. Bar No. 34364/SBN 24032529
1001 McKinney, Suite 1500

Houston, TX  77002
Tel:    (713) 520-1900
Fax:    (713) 520-1025
jdavis@mcglinchey.com
amhill@mcglinchey.com

**RUDY CERONE** (Louisiana Bar # 14137)
(Admitted Pro Hac Vice)
601 Poydras Street, 12th Floor
New Orleans, LA 70130
Tel:    (504) 586-1200
Fax: (504) 596-2800
rcerone@mcglinchey.com

*Attorneys for Movant,*
*Capmark Bank, a Utah industrial bank*

## <u>CERTIFICATE OF SERVICE</u>

I, Anne Marie Laney Hill, hereby certify that the above referenced objection was electronically filed with the U. S. Bankruptcy Clerk and served in accordance with Local Bankruptcy Rule 9013(f) and in a manner consistent with Fed. R.  Bankr. P. 7004(b) to all required parties listed on the attached service list on January 24, 2011.

See attached Service List

*/S/  Anne Marie Laney Hill*
Anne Marie Laney Hill